**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SMALLHOLD, INC.,[1]<br><br>                     Debtor. | Chapter 11<br><br>(Subchapter V)<br><br>Case No. 24-10267 (CTG)<br><br>**Re: D.I. 228**<br>**Obj. Deadline: August 13, 2024 @ 4 pm ET**<br>**(for UST and Subchapter V Trustee)**<br>**Hearing Date: August 22, 2024 @ 3:30 pm ET** |

**UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF THE
SUBCHAPTER V DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION**

      Andrew R. Vara, the United States Trustee for Region 3 ("U.S. Trustee"), by and through his undersigned counsel, hereby files this objection ("Objection") to confirmation of the *Subchapter V Debtor's Second Amended Plan of Reorganization* (the "Plan"), and in support of this Objection states:

**PRELIMINARY STATEMENT**

      1.      The Debtor's Plan should not be confirmed in its present form because it (1) extracts non-consensual third-party releases from holders of claims or interests that (a) vote to accept the Plan or are presumed to have accepted the Plan, (b) who voted to reject the Plan unless they also check an opt-out box, and (c) holders of claims or interests that are entitled to vote and do not cast a ballot, including those who may not have received the solicitation materials, and (2) proposes to treat the whole Plan as a settlement, where it is not one.

---

[1] The last four digits of the Debtor's federal tax identification number are 8880. The Debtor's mailing is 285 Nostrand Avenue #1066, Brooklyn, NY 11216.

2. First, acceptance of the Plan by voting, or presumed acceptance of the Plan under section 1126 of the Code, does not equate to consent to a release of direct claims held by non-debtors against non-debtors. Treatment of a claim under the Plan and agreement to release non-debtors are two separate and distinct concepts.

3. Even as to creditors in voting classes who vote to reject the Plan, the opt-out process does not reflect consent to the third-party release. The Supreme Court in *Purdue Pharma* did not "express a view on what qualifies as a consensual release." *Harrington v. Purdue Pharma L.P.*, 603 U.S. ___, 144 S. Ct. 2071, 2088 (2024). But from the Supreme Court's pronouncement that non-consensual releases of non-debtors by non-debtors are not authorized under the Bankruptcy Code, it follows that proposed "consensual" releases must be heavily scrutinized as to whether they are indeed consensual. Here, the Plan's third-party release provisions must be stricken because they would allow such releases, even where a so-called "Releasing Party" has not affirmatively agreed to them.

4. This Court has previously found that "the opt out mechanism is not sufficient to support the third party releases. . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *In re Washington Mut., Inc.,* 442 B.R. 314, 355 (Bankr. D. Del. 2011) (Walrath, J.). This Court has also rejected the debtors' argument that deeming consent from silence "should be approved as typical, customary, and routine." *Emerge Energy Services LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (Owens, J.). In *Emerge,* this Court held that "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" to treat "a party's silence or inaction" as the necessary "affirmative consent." *Id.*

5. Second, the Plan contains an impermissible provision whereby the Plan as a whole is proposed to be treated as a settlement. This Plan is not a settlement; the Plan is governed by the applicable confirmation standards under the Code. *See* Plan § 6.9.

6. For the reasons below, confirmation of the Debtor's Plan should be denied.

## JURISDICTION, VENUE AND STANDING

7. Under (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine confirmation of the Plan and this Objection.

8. Pursuant to 28 U.S.C. § 586, the U. S. Trustee is charged with the administrative oversight of cases commenced pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). This duty is part of the U. S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.),* 898 F.2d 498, 500 (6th Cir. 1990) (describing the U. S. Trustee as a "watchdog").

9. Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in Chapter 11 cases and to comment on such plans and disclosure statements.

10. The U.S. Trustee has standing to be heard on Plan confirmation pursuant to 11 U.S.C. § 307.

## BACKGROUND

11.This case was filed on February 18, 2024. The Debtor elected to proceed under subchapter V of chapter 11 of the Bankruptcy Code.

12.On February 20, 2024, the U.S. Trustee appointed Jami Nimeroff to serve as the subchapter V trustee.

13.On May 20, 2024, the Debtor filed the *Subchapter V Debtor's Plan of Reorganization*. [D.I. 162].

14.On June 3, 2024, the Debtor filed the *Subchapter V Debtor's First Amended Plan of Reorganization.* [D.I. 179].

15.On June 4, 2024, the Debtor filed the *Notice of Hearing to Consider Confirmation of the Plan and the Objection Deadline Related Thereto* [D.I. 183].

16.On June 26, 2024, the Debtor filed the *Plan Supplement/Notice of Filing Plan Supplement* [D.I. 201].

17.On July 25, 2024, the Debtor filed the *Subchapter V Debtor's Second Amended Plan of Reorganization.* [D.I. 228].

*Relevant Plan Provisions*

18.Section 6.9 of the Plan contains the following provision casting the provisions of the Plan as a settlement:

> **Compromise and Settlement of Claims and Controversies**
>
> Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such

compromise or settlement is in the best interests of the Debtor, its Estate and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

Plan § 6.9

19. Section 6.10 of the Plan details the Releases by the Debtor (the "Debtor Release"):

**Releases by the Debtor**

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in this Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Debtor and the consummation of the transactions contemplated by this Plan, on the Effective Date, the Released Parties are deemed forever released by the Debtor and its Estate, and each of their successors and assigns, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor or the Estate, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor or its Estate would have been legally entitled to assert in its own right (whether individually or collectively) based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Case, the DIP Loan, the DIP Loan Documents, the business or contractual arrangements between the Debtor and any of the Released Parties, the negotiation, formulation or preparation of this Plan, any Plan Supplement or related agreements, instruments or other documents (collectively, the "Debtor Released Claims"), other than Debtor Released Claims against a Released Party arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity.

Plan § 6.10.

20. Section 6.11 of the Plan provides for Releases by Holders of Claims and Equity Interests (the "Third Party Releases"):

**Releases by Holders of Claims and Equity Interests**

On the Effective Date, except as otherwise provided herein and except for the right to enforce this Plan, **all persons (i) who voted to accept this Plan or who are presumed to have voted to accept this Plan and (ii) who voted to reject this Plan but did not affirmatively mark the box on the ballot to opt out of granting the releases provided under this Plan,** under section 1126(f) of the Bankruptcy Code shall, to the fullest extent permitted by applicable law, **be deemed to forever release, and waive the Released Parties of and from all liens, claims, causes of action, liabilities, encumbrances, security interests, interests or charges of any nature or description whatsoever based or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Case or affecting property of the Estate, whether known or unknown, suspected or unsuspected, scheduled**

> or unscheduled, contingent or not contingent, unliquidated or fixed, admitted or disputed, matured or unmatured, senior or subordinated, whether assertable directly or derivatively by, through, or related to any of the Released Parties and their successors and assigns whether at law, in equity or otherwise, based upon any condition, event, act, omission occurrence, transaction or other activity, inactivity, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date in any way relating to or arising out of, in whole or in part, the Debtor, the Debtor's prepetition operations, governance, financing, or fundraising, the purchase or sale of the Debtor's securities, the Chapter 11 Case, the pursuit of Confirmation of this Plan, the consummation of this Plan or the administration of this Plan, including without limitation, the negotiation and solicitation of this Plan, the DIP Loan, and the DIP Loan Documents, all regardless of whether (a) a Proof of Claim or Equity Interest has been filed or is deemed to have been filed, (b) such Claim or Equity Interest is allowed, or (c) the Holder of such Claim or Equity Interest has voted to accept or reject this Plan, except for willful misconduct, gross negligence, fraud or criminal misconduct; *provided, however*, that the Debtor shall not be a Released Party until the Last Distribution Date if the Plan is confirmed under section 1191(b) of the Bankruptcy Code. Nothing contained herein shall impact the right of any Holder of an Allowed Claim or Interest to receive a Distribution on account of its Allowed Claim or Allowed Interest in accordance with this Plan.

Plan § 6.11. (emphasis altered).

    21.    Section 9.88 of the Plan lists the definition of "Released Party":

> **"Released Party"** means each of the following: (a) the Debtor (but only if the Plan is confirmed under section 1191(a) of the Bankruptcy Code); (b) the Debtor's prepetition attorneys and professionals; (d) the Debtor's Professionals; (e) the DIP Lender; (f) the DIP Lender's attorneys; and (g) the Representatives of (a) through (f) hereof. If the Plan is confirmed under section 1191(b), the Debtor shall be a Released Party only on the Last Distribution Date.

Plan § 9.88.

    22.    Section 9.89 of the Plan lists the definition of "Representatives":

> **"Representatives"** means, without limitation, any existing or former affiliate, subsidiary, member, officer, director, partner, stockholder, trustee, member, representative, employee, agent, attorney, business advisor, financial advisor, accountant, other Professional, their successors or assigns, or any Person who is or was in control of any of the foregoing.

    23.    Section 6.13 of the Plan, titled "Injunction Related to Third Parties," provides:

> From and after the Effective Date, all persons who have held, hold or may hold Claims against or Equity Interests in the Debtor are permanently enjoined from

6

commencing or continuing in any manner, any Cause of Action released, to be released or discharged pursuant to this Plan, or the Confirmation Order, from and after the Effective Date, to the extent of the releases, exculpation, and discharge granted in this Plan, all Holders of Claims or Equity Interests shall be permanently enjoined from commencing or continuing in any manner against the Released Parties and the Exculpated Parties and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to this Plan. except as otherwise expressly provided in this Plan, the Plan Supplement or related documents, or for obligations issued pursuant to this Plan, all persons who have held, hold or may hold Claims or Equity Interests that have been released, discharged, or are subject to exculpation, are permanently enjoined, from and after the Effective Date, from taking any of the following actions: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such persons on account of or in connection with or with respect to any such Claims or Equity Interests; (c) creating, perfecting or enforcing any encumbrance of any kind against such persons or the property or estates of such persons on account of or in connection with or with respect to any such Claims or Equity Interests; and (d) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released, settled or discharged pursuant to this Plan.

## ARGUMENT

I.    **The Plan is Not Confirmable as Proposed**

*Presumed Acceptance of the Plan, Voting to Accept the Plan, and the Opt-Out Procedure Will Result in Non-Consensual Third-Party Releases Which Are Not Authorized Under the Bankruptcy Code.*

24.    Non-consensual third-party releases are not authorized under the United States Bankruptcy Code. *In re Harrington v. Purdue Pharma, L.P.,* 144 S.Ct. 2071, 2082-88 (2024).

25.    Contract principles govern whether a release is consensual. *In re SunEdison, Inc.,* 576 B.R. 453, 458 (S.D.N.Y. Bankr. 2017) ("SunEdison"). Contract principles govern because a third-party release is essentially a settlement between a non-debtor claimant and another non-debtor. The "general rule of contracts is that silence cannot manifest consent." *Patterson et al. v. Mahwah Bergen Retail Grp., Inc.,* 636 B.R. 641, 686 (E.D. Va. 2022) ("Mahwah"). "Most courts allow consensual nondebtor releases to be included in a plan. . . that are specific in language,

7

integral to the plan, a condition of the settlement, and given for consideration." *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775-76 (Bankr. N.D. Tex. 2007).

26. Under contract law, silence does not equal consent except under limited circumstances not applicable here. *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000) (writing under Delaware law, "Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only: [w]here an offeree takes the benefit of offered services with a reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.").

27. As a general rule of contract construction:

> Acceptance by silence is exceptional. Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance. See Comment b to § 53. The usual requirement of notification is stated in § 54 on acceptance by performance and § 56 on acceptance by promise. The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak. The exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds. See Chapter 5.

RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981).

28. Silence and inaction, however, will generally not be deemed assent to an offer because Delaware follows the "mirror image" rule, requiring the acceptance to be identical to the offer. *See Urban Green Techs., LLC v. Sustainable Strategies 2050 LLC*, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017); *see also Patterson et al. v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 686 (E.D. Va. 2022) (contract law does not support consent by failure to opt out).

29. The Third-Party Releases in the Plan, which benefit numerous non-debtors that are Released Parties and their Representatives, will be given by a variety of non-debtor parties, all without their affirmative consent: (i) all parties who vote to accept the Plan, (ii) those who vote to reject the Plan, unless they check an opt-out box, (iii) unimpaired claimants or holders of interests, and (iv) all creditors in voting classes who do not vote on the Plan. Because the Plan forces third-party releases on these parties without their affirmative consent, the releases are non-consensual and cannot be approved under *Purdue Pharma*.

30. Here, the Debtors have structured a voting procedure that attempts to equate a vote to accept the creditor's treatment under the Plan with the creditor's agreement to release its claims against non-Debtors who are not the subject of this bankruptcy case. The voting materials present the decision to accept the Plan (and thereby grant a release of non-Debtor third parties) as irrevocable.

31. As an initial matter, voting for a plan does not reflect the unambiguous assent that should be required to find consent to a release. *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (holding that, because consensual releases are premised on the party's agreement to the release, "it is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan").

32. First, imputing consent from a vote in favor of a plan assumes that the creditor understands the plan's non-debtor release, which is a questionable assumption for the reasons discussed below. Thus, voting for a plan does not necessarily reflect actual and knowing consent, particularly in the context of "an immensely complicated plan" where "it would be difficult for any layperson to comprehend all of its details." *In re Congoleum Corp.*, 362 B.R. at 194.

33. Second, a plan is presented as a package deal—a person votes yes or no on the entire plan, not particular aspects of it—and a person should not be compelled to accept a non-debtor release as a condition of receiving the benefits of a plan. That is not true consent. In addition, the Bankruptcy Code guarantees that a creditor may not be required to accept in a chapter 11 plan less than it would receive in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7)(A). But a chapter 7 liquidation could not require a release of non-debtors as a condition of receiving a distribution (because it does not involve a plan). Requiring a non-debtor release as a condition of receiving a distribution under a chapter 11 plan, absent the individual creditor's consent, is thus inconsistent with § 1129(a)(7)(A).

34. As to the Plan provisions that those who vote to reject must also check an opt-out box to avoid being deemed to consent to give Third Party Releases, the Bankruptcy Court for the Southern District of New York, in *In re Chassix Holdings*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015), made the following observation:

> If (as prior cases have held) a creditor who votes in favor of a plan have implicitly endorsed and 'consented' to third party releases that are contained in that plan, then by that same logic a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. ***The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.***

*Id*. at 79 (emphasis added). Similarly, the *Mahwah* court, in applying black letter contract principles to opt-out releases in a chapter 11 plan, found that contract law does not support consent by failure to opt-out. *Mahwah*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id*. at 688.

35. As this Court noted in *Emerge*, "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as waiver through a party's

silence or inaction. *In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019).

36. This Court in *Emerge* indicated that it "has concluded that a waiver cannot be discerned through a party's silence or inaction unless specific circumstances are present." *Id*. at *54-55; the Court stated that "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as such circumstances. *Id*. at *55. The Court's statements in *Emerge* apply irrespective of whether a creditor or shareholder is to receive a distribution under a plan or not.

37. The Debtors may try to distinguish this case from *Emerge* based on the argument that *Emerge* dealt with creditors and shareholders who were receiving no distribution under the plan. However, the Court's decision in *Emerge* was not expressly limited to such a factual situation. To the contrary, the Court's recognition that failure to return a notice can be due to "carelessness, inattentiveness, or mistake," rather than constituting the manifestation of an intent to agree to a third party release, would be applicable regardless of whether a creditor or interest holder was to receive a distribution under a plan. Furthermore, here, the General Unsecured Claimants are projected to get some recovery, but it is virtually nothing as claimants asserting $10,133,500.10 in claims will divide a meager $70,000.00 (a recovery of less than 1%) and are not projected to receive any distribution until year 5 of the Plan. Plan, § 2.1; Ex. B (financial projections).

38. The non-consensual Third-Party Release will also be imposed on unimpaired claimants or holders of interests who receive a notice informing them that, unless they go to a hyperlink taking them to the claims agent's website and affirmatively opt out of giving third-party releases, they will be deemed to have consented to same. For the same reasons discussed in

*Chassix* and *Emerge*, such "deemed consent" does not constitute the affirmative consent required to support a consensual release.

39. The unimpaired claimants on whom Third Party Releases will be imposed appear to include holders of administrative claims and priority tax claims. The claims to be released include direct claims that unimpaired parties hold against numerous non-debtors. While unimpaired creditors will be eventually paid in full on the claims they hold against the Debtor, the scope of the release of their direct claims against non-debtors is far broader than the claims upon which they will be paid. The release covers any claims against non-debtors Released Parties that are:

> "of any nature or description whatsoever based or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Case or affecting property of the Estate, whether known or unknown, suspected or unsuspected, scheduled or unscheduled, contingent or not contingent, unliquidated or fixed, admitted or disputed, matured or unmatured, senior or subordinated, whether assertable directly or derivatively by, through, or related to any of the Released Parties and their successors and assigns whether at law, in equity or otherwise, based upon any condition, event, act, omission occurrence, transaction or other activity, inactivity, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date in any way relating to or arising out of, in whole or in part, the Debtor, the Debtor's prepetition operations, governance, financing, or fundraising, the purchase or sale of the Debtor's securities, the Chapter 11 Case, the pursuit of Confirmation of this Plan, the consummation of this Plan or the administration of this Plan, including without limitation, the negotiation and solicitation of this Plan, the DIP Loan, and the DIP Loan Documents . . ."

Plan § 6.11 (in pertinent part).

40. So, for example, a taxing authority whose priority claim against the Debtor will be paid in full under the Plan (as required by the Code) could later be subject to an argument by a Released Party that it has no obligation to pay taxes in connection with revenue received from transactions with the Debtors because, under the Plan, the taxing authority has been deemed to release the Released Party for all claims related in any manner to the Debtor.

41.     Creditors in voting classes who do not vote on the Plan shall also be stripped of their direct claims against non-debtors, regardless of the reason they did not vote. Those reasons may include that such creditors (a) never received the solicitation package, or received it late, due to mail errors or delays, or (b) received it timely, and completed it and returned it to the balloting agent, but through no fault of their own, the ballot never reached the balloting agent, or was received late. Other creditors in voting classes may receive the solicitation package, but not understand it, and may not have the time or financial resources to engage counsel and would never imagine that their rights against non-debtors could be extinguished through the bankruptcy of this Debtor.

42.     Conspicuous warnings in the disclosure statement, on the plan ballots, or on an opt-out form that silence or inaction will constitute consent to a release are not sufficient to convert a creditor's silence into consent to the release. *SunEdison*, 576 B.R. at 458-61. In *SunEdison*, the debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *Id.* at 460. The court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors' silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id.* The debtors did not contend that an ongoing course of conduct between themselves and the nonvoting creditors gave rise to a duty to speak. *Id.*

43.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 88 (Bankr. S.D.N.Y. 2015).

Moreover, the court in *SunEdison* observed that parties who are solicited, but do not vote, may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461.[2]

44. In sum, there will be no affirmative consent to Third-Party Releases given by numerous persons and entities on whom such releases will be imposed. Such releases are therefore non-consensual.[3]

45. This Court may not approve the injunction enforcing the "opt out" release by parties in interest against non-debtors because *Purdue* clearly stands for the proposition that non-consensual third-party releases are not permitted by the Bankruptcy Code. *See Purdue Pharma*, 603 U.S. at ____, 144 S.Ct. at 2088. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and this case is not asbestos-related. *See Purdue*, 144 S.Ct. at 2085 (citing 11 U.S.C. § 524(e)). Additionally, if the plan contained a consensual third-party release, there would be no need for an injunction to support same, as an injunction in support of a purely consensual release is, by definition, not necessary to prevent "immediate and irreparable harm" to either the estate or the released parties. The consensual releases may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors, and there is no reason for this Court to be involved with the post-effective date enforcement of those releases.

---

[2] Not all decisions from this District have required affirmative consent for third party releases. In *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013), this Court reached a different conclusion than that of *Emerge* and the other cases cited above concerning the need for affirmative consent to third party releases.

[3] The U.S. Trustee argues that the entire third-party release should be removed from this Plan as non-consensual. If this Court determines to allow the third-party release, the definition of Released Party should be significantly pared down to remove "Representatives," as those parties have provided no consideration to justify a release and only have an attenuated connection to the case. The U.S. Trustee has raised this issue with respect to the Debtor Release as well and remains in discussions with the Debtor as to a resolution. The U.S. Trustee reserves all rights with respect to same.

II. **Plan Impermissibly Deemed to Be a Settlement**

46. Section 6.9 of the Plan provides:

**Compromise and Settlement of Claims and Controversies**

Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

Plan § 6.9

47. Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to "provide for [] the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A) (emphasis added).

48. Section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims that creditors and interest holders may have against it, which is what Plan § 6.9 seeks to do. *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest belonging to the debtor or to the estate.' . . . It is significant that there is no parallel authorization regarding claims against the estate.") (quoting section 1123(b)(3)(A)) (internal citation omitted).

49. The resolution of claims against the Debtors is governed by sections 1129 and 1141.

50. A plan may incorporate one or more negotiated settlements, but a plan is not itself a settlement. Sending a plan to impaired creditors for a vote is not equivalent to parties negotiating

15

a settlement among themselves. A "settlement" is "an agreement ending a dispute or lawsuit." BLACK'S LAW DICTIONARY (10th ed. 2014). An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." *Id.*

51.  Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n motion by the trustee [or chapter 11 debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.

52.  The decision whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *Wash. Mut., Inc.*, 442 B.R. at 338 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)). In contrast, chapter 11 plans are subject to the requirements of Bankruptcy Code sections 1123 and 1129. What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" outside of the plan context is different from what may be permissible under a plan.

53.  Here, Plan § 6.9 purports to treat the Plan itself as if it were a Rule 9019 "settlement." Further, it appears § 6.9 is not limited to settling claims belonging to the Debtor or the estate. Thus, § 6.9 exceeds the scope of what can be settled under section 1123(b)(3)(A). Unless § 6.9 is narrowed so that (i) it pertains only to claims the Debtors are settling against others and (ii) the Plan itself is not a settlement, the Plan does not comply with section 1123(b)(3)(A) and does not satisfy section 1129(a)(1).

## CONCLUSION

In conclusion, for the reasons specified above, the U.S. Trustee requests that confirmation of the Plan be denied, or in the alternative, the Court direct that the Plan be modified to address his concerns listed above.

**Dated:** August 13, 2024

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: /s/ *Joseph F. Cudia*
Joseph F. Cudia
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Telephone: 202-934-4051
E-Mail joseph.cudia@usdoj.gov