```
                   IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE DISTRICT OF DELAWARE

IN RE:                           .       Chapter 11
                                 .       Subchapter V
SMALLHOLD, INC.,                 .
                                 .
     Debtor.                     .       Case No. 24-10267 (CTG)
                                 .
                                 .       August 22, 2024
 . . . . . . . . . . . . . . . . .       10:00 a.m.
 .
```

```
                      TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE CRAIG T. GOLDBLATT
                 UNITED STATES BANKRUPTCY JUDGE
```

Appearances:

Counsel to Debtor:          Pashman Stein Walder Hayden P.C.
                            BY:  HENRY J. JAFFE, ESQ.
                                 JOSEPH C. BARSALONA II, ESQ.
                                 ALEXIS R. GAMBLE, ESQ.
                            824 North Market Street, Suite 800
                            Wilmington, DE 19801
                            Phone:   (302) 592-6496
                            Email:   hjaffe@pashmanstein.com
                                     jbarsalona@pashmanstein.com
                                     agambale@pashmanstein.com

Subchapter V Trustee:       Brown Nimeroff
                            BY:  JAMI NIMEROFF, ESQ.
                            Two Penn Center, Suite 610
                            1500 JFK Blvd.
                            Philadelphia, PA 19102
                            Phone:   (267) 861-5335
                            Email:   jnimeroff@brownnimeroff.com


Audio Operator:             Alice Doody, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

Appearances (cont'd):

```
Counsel to US Trustee:      Office of the US Trustee
                            BY: ROSA SIERRA FOX, ESQ
                                JOSEPH CUDIA, ESQ.
                            844 King Street, Suite 2207
          `                 Wilmington, DE 19801
```

# I N D E X

**HEARING REGARDING:** Debtor's Third Amended Plan of
Reorganization [with Technical Modifications] (D.I. 250)

                                                          **PAGE**

**EXHIBITS**
S1   Jawad Declaration                                      9
S2   Jawad Supplemental Declaration                         9
S3   Financial Projections                                 10
S4   Final Capital letter of intent                        10
S5   First amended plan                                    10
S6   Young Declaration                                     11
S7   Young Supplemental Declaration                        11

**RULING:** Confirmation Approved

4

1          THE COURT:  Be seated.

2          So, good morning.  We're here in In Re Smallhold,

3   which is Case No.  24-10267.

4          Mr. Barsalona, you can proceed.

5          MR. BARSALONA:  Good morning, Your Honor.  For the

6   record, Joe Barsalona from Pashman Stein Walder & Hayden on

7   behalf of the debtor, Smallhold, Inc.  With me at counsel table

8   is my partner, Henry Jaffe, as well as my colleague, Alexis

9   Gambale, and also Amy Oden is also sitting in the gallery.

10          Also in the gallery is our witness, Mr. Tariq Jawad

11   who is a board member and also the interim CFO of the company.

12          Your Honor, we're hopefully going to have a short

13   agenda today.  Obviously, the big item is confirmation.  But

14   first let me touch on No. 2 which s the motion of KSS Sales.  I

15   understand that counsel has uploaded that order, so that is

16   ready to be uploaded there.

17          THE COURT:  That's the administrative claim, the

18   allowed administrative claim.

19          MR. BARSALONA:  That is correct.  That's correct.

20          THE COURT:  Okay.  So we'll enter that order after

21   the hearing.

22          MR. BARSALONA:  Thank you, Your Honor.

23          So moving on to confirmation, although this was a

24   small business case, Your Honor, it had big drama in it.  It's

25   lasted more months than we had hoped, but we are here with what

1  we believe an incredibly value maximizing plan for all of the

2  debtor's constituents.

3          As we stand here today, Your Honor, the only aspect

4  that is contested is the release provisions which we will get

5  to later today.  And for purposes of the record, the Camber

6  objection is either moot or has been abandoned.  I understand

7  from Mr. Ward who is in the gallery who represents Capital, who

8  of course purchased the claims that Camber once held, will not

9  be prosecuting that objection.  We had extended Capital's

10 independent objection deadline to last Friday.  They chose not

11 to file one, and talks continue between the debtor as well as

12 Capital to make sure there is minimal drama going forward post-

13 effective date.

14         But with that, Your Honor, we would like to go to

15 confirmation.  And as it pleases the Court, we would like to

16 first handle the evidentiary record.  My partner, Henry Jaffe,

17 will manage that.  And then after that, if the Court or other

18 parties have questions related to the plan, I can answer that.

19 And then after that we can proceed to the oral argument on the

20 release provisions followed the order.

21         If that's acceptable to Your Honor, I'll hand off the

22 lectern.

23         THE COURT:  That makes good me, Mr. Barsalona.  So

24 thank you.

25         MR. BARSALONA:  Thank you, Your Honor.

1              THE COURT:  Mr. Jaffe.

2              MR. JAFFE:  Good morning, Your Honor, may it please

3 the Court, Henry Jaffe, Pashman Steinwalder Hayden.  As Mr.

4 Barsalona mentioned, I am here today to deal with what I hope

5 is going to be a very brief and hopefully persuasive

6 evidentiary portion.  In order to assist the Court and to make

7 this a little more streamlined, we have presented testimony by

8 declaration, so let me get into that.

9              Your Honor, we have two witnesses today.  We have

10 Tariq Jawad, who as Mr. Barsalona noted, is in the courtroom.

11 He has submitted declarations and he is available to testify if

12 necessary.   We also have Emily Young who is the director of

13 Epiq.  Ms. Young would be available to testify by phone in

14 support of plan, solicitation of plan, voting process.

15             Your Honor, let me start with Mr. Jawad.  We filed

16 two declarations for Mr. Jawad in support of plan confirmation.

17 The first declaration was filed last Friday, it's Docket No.

18 242.  These are for the most part the general statements of

19 fact that are needed to support plan confirmation under

20 applicable portions of chapter 11, and also the subchapter V

21 standards.

22             We also filed a supplemental declaration.  And by the

23 way, that is going to be Exhibit S1.  We also filed a

24 supplemental declaration yesterday, Your Honor, and that is our

25 exhibit S2.  The Exhibit S2 contained also two other exhibits,

1 they are in the declaration, that are Exhibits 1 and 2.  But
2 for purposes of the record today, they are Exhibits S3 and S4.
3 We also have S5 which is a copy of the first amended plan which
4 the Court could take judicial notice of.

5            So just to give the Court a little flavor, let me
6 explain briefly why we filed the supplemental declaration.
7 There are a couple of main reasons we did that.

8            First of all, Your Honor, we wanted to lay a proper
9 foundation for the admission of the financial projections.  And
10 in doing so, we explained the bonafides of Mr. Jawad's career,
11 his history of financial background, also his experience in
12 being an interim CFO and consultant to companies in these types
13 of spaces.  And we wanted to show that the projections were not
14 only more than reasonably likely, which is the standard under
15 the subchapter V in order to have the exception to the absolute
16 priority rule, but actually more than that, we think the
17 projections are viable, conservative and readily achievable.

18            In addition, Your Honor, we wanted to file it and I
19 will take an aside here, we have had a very productive
20 relationship with the subchapter V trustee who has really done
21 a great job of doing what she should do which is to bring
22 issues to our attention, things that concerned her.  And we
23 wanted to make sure we had a very fulsome declaration to ensure
24 that we addressed her issues and her concerns, some of which we
25 hadn't really thought through, and really did the whole process

1  a great favor by providing input.

2          Secondly, we wanted to provide some additional

3  testimony in support of the plan sponsor who among other things

4  is going to be backstopping the payment of all general

5  unsecured claims as projected under the financial projections,

6  and also the lion's share of the administrative claims.  It's

7  quite an undertaking, and we wanted to support the bonafidea of

8  the plan's sponsor who has been an excellent financial partner

9  and supporter of the debtor throughout this entire chapter 11

10 process.

11         Finally, Your Honor, we wanted to provide some more

12 color to the process that occurred where the debtor was

13 receiving expressions of interest from an entity known as

14 Capital 1 LLC.  We wanted to show that there was really a very

15 fulsome process that occurred here, that we had a really I will

16 say a really tremendous independent director slate that took

17 these proposals once they became serious, once they became

18 proposals that were in some way competitive with the then

19 existing file plan, they took them very seriously, they engaged

20 in the process where they took the offers, they considered

21 them, they asked questions, and they went back to the plan

22 sponsor and approved the treatment, not just on secured

23 creditors; they approved backstops, included post-petition

24 financing.

25         Where we are with the plan from the beginning to

1  where we are now is light years, and it's in no small measure

2  due to the efforts of the independent directors who I've said

3  have done a tremendous job especially considering the

4  challenges in the subchapter V case where maybe equity is, you

5  know, where the company doesn't necessarily have to go up for

6  sale, but they treated it as though they had very serious and

7  important duties to creditors, and I think that is evident in

8  the result.

9          So with that, Your Honor, I would like to offer into

10 evidence to begin declarations of Mr. Jawad, those are Exhibits

11 S1 and S2.

12         THE COURT:  Okay.  Is there any party in interest

13 that would like to be heard with respect to the admission into

14 evidence of either of Mr. Jawad's declarations that are at S1

15 and S2, and they are docketed at D.I. 242 and 256 respectively?

16         Okay.  Seeing none, those declarations will be

17 admitted into evidence.

18         (Exhibits S1 and S2 admitted into evidence.)

19         THE COURT:  Is there any party in interest that would

20 like to cross-examine  Mr. Jawad with respect to the matters

21 set forth in those declarations?

22         Okay.  Seeing none, Mr. Jaffe, you can proceed.

23         MR. JAFFE:  Great.  Your Honor, as I said, we were

24 laying a foundation for other exhibits, and so in light of the

25 admission of those declarations, I would further seek to admit

1 Exhibit S3 which is the financial projections, S4 which was the

2 final Capital letter of intent or proposal that was made which

3 the board responded to, and the first amended plan which is S5.

4 Of course, the Court can take judicial notice.  The purpose of

5 these things is to give the Court some insight into how far

6 this process has led the board to push the plan sponsor in a

7 very productive way and improve treatment for creditors and

8 improve the viability of the plan.

9          THE COURT:  Okay.  Thank you, Mr. Jaffe.

10          Is there any party in interest that objects to the

11 admission into evidence of the three documents that Mr. Jaffe

12 has identified that are Exhibits S3, S4, and S5?

13          Okay.  Seeing no objection, those will be admitted.

14          (Exhibits S3, S4 and S5 admitted into evidence.)

15          MR. JAFFE:  Thank you, Your Honor.

16          The last part of testimony and exhibit admission

17 relates to declarations that we filed for Ms. Young.  We filed

18 a declaration at Docket No. 212 which is Exhibit S6.  This is

19 an initial declaration that discusses solicitation and

20 balloting efforts of Epiq, and also discusses ballot results.

21          In addition, we have the declaration of Ms. Young

22 which was filed on August 16th, Docket No. 245, this is Exhibit

23 S7.  Provides updating balloting results which reflect the DIP

24 lender converting its vote to a no vote, from a no vote to a

25 vote in favor.  And I would offer these two declarations into

1  evidence as well, Your Honor.

2        THE COURT:  Okay.  So is there any party in interest

3  who would like to be heard with respect to the admission into

4  evidence of the two declarations of Ms. Young that are Exhibits

5  S6 and S7, and are docketed at D.I. 212 and 245?

6        Seeing no objection, those declarations will be

7  admitted into evidence.

8        (Exhibits S6 and S7 admitted into evidence.)

9        THE COURT:  Is there any party in interest that

10  wishes to cross-examine Ms. Young with respect to the matters

11  set forth in her declaration?  Okay.  I'm seeing none.

12        Mr. Jaffe, you can proceed.

13        MR. JAFFE:  Thank you, Your Honor.  That concludes

14  our evidentiary presentation for today.  Unless Your Honor has

15  any further questions, I'll sit down so Mr. Barsalona can

16  continue his presentation.

17        THE COURT:  Okay.  I don't have questions about the

18  evidentiary record, so I appreciate that, Mr. Jaffe.  I'm happy

19  to allow you to pass the baton back.

20        MR. JAFFE:  Thank you, Your Honor.

21        THE COURT:  Thank you, Mr. Jaffe.

22        Mr. Barsalona?

23        MR. BARSALONA:  Thank you, Your Honor.   And now we

24  get to the plan, which as I stated is a far different plan than

25  what we filed on our 90 day deadline back in May.  And what

1  started as 1191(b) plan remains an 1191(b) plan, there's no

2  question about that.  We had always intended that an

3  administrative claims would be paid under the terms of the

4  plan, and for that solicitation really did not matter.

5          Nevertheless, we still wanted to canvas all of our

6  creditors to make sure that what they were seeing was

7  acceptable to them.  And notwithstanding the fact that we only

8  got three rejecting votes, eight creditors that did vote to

9  accept.  That will play a role later on when we talk about

10 releases, but there are only accepting parties, all of which

11 through the mechanics of the release provision, you know, are

12 deemed to consent to those releases.

13         The plan is phenomenal in a couple of reasons, Your

14 Honor.  In addition for the administrative claims to be paid in

15 full, those same claimants have the election to choose a

16 convertible loan note feature, which means once they become an

17 allowed claim, they're going to be sent the notice that we've

18 attached to our proposed confirmation order, and they will get

19 to choose cash in full or to be part of the capital structure

20 which is a paid interest of 8 percent once they are converted

21 at either the end of the plan term or a bonafide equity

22 financing or a merger.  So they can get the entire upside of

23 the company.

24         We thought this was particularly attractive to those

25 creditors that are competitors to ours and we are already in

1 discussions on a potential combination such as KSS as well as

2 Capital.

3        In addition, Your Honor, the GUC recoveries have

4 increased tenfold in our mind from where they were initially

5 that showed there was no disposable income that would flow down

6 to the debtors to now having upwards of 155 grand that will

7 flow to the creditor body.  We have a relatively small

8 creditor, general unsecured creditor body all things

9 considered.  So this is a, you know, market recovery, and

10 things that we're talking about and may do with respect to the

11 capital claim may also increase those recoveries for other

12 parties.  And, of course, Your Honor --

13        THE COURT:  I should know the answer to this and I

14 apologize.  But in terms of the claims reconciliation process,

15 how far along is it?  Do we have a sense from the perspective

16 of the unsecured creditors what the universal claims looks like

17 or is that --

18        MR. BARSALONA:  Yes.  I will say it's about $6

19 million of GUCs, but 4 million of that is capital.  So, and of

20 course, of that 2 million, there's a large piece that were

21 critical vendors and other parties in interest that we are

22 working with and vendors that we will continue to work with

23 over the course of the plan.

24        THE COURT:  Okay.  That's helpful.  Thank you.

25        MR. BARSALONA:  Of course.  ANd also a major feature,

1  Your Honor, of course, was the convertible loan note with

2  respect to the DIP financing as well as the exit financing

3  which is 500K new money that's being put in subject to the

4  terms of the term sheet.  And we are feverishly working on

5  those documents, Your Honor, we're probably going to file an

6  additional plan supplement.  In fact, we plan on it with those

7  final documents post confirmation to make sure the record is

8  clear and everything is there.  But to, that is a gift.

9          I will say that is an incredible gift that goes to

10  what Mr. Jaffe had said about how important our plan sponsor

11  and a partnership it has been with Monomyth since day one, that

12  they are taking this money that they have put in, that they had

13  all the bells and whistles of the DIP.  We had a contested

14  interim DIP hearing in this Court months ago on the terms, and

15  we wanted to make sure it's an insider DIP and there were very

16  tight time strings or, you know, features of it that Ms.

17  Nimeroff had issues with, the UST had issues with and we wanted

18  to make sure that at the end of the day that it was a fair

19  result for the company.

20          And, you know, from my personal opinion, the DIP

21  lender has gone above and beyond to do that by basically

22  forgiving it.  Obviously, there are bells and whistles

23  connected to the notes that it is not a complete waiver of that

24  claim, but still it is not 970 approximately on our balance

25  sheet unsecured debtor post-effective date, but is now in this

1 note structure.

2         So that is the plan, Your Honor.  We put forth our

3 brief in support of why it can be confirmed under 1191(b), it's

4 a five year plan, we will have post-confirmation reporting

5 consistent with the U.S. Trustee guidelines on that on a

6 quarterly basis.

7         And so we are still in this pseudo realm of some type

8 of bankruptcy post-effective date.  And the majority of things

9 we could do outside of it.  But this will allow the company to

10 prosper and take the trajectory positive with this very

11 important and valuable brand for the next hopefully many, many

12 years to come.

13         THE COURT:  Okay.  Thank you.

14         MR. BARSALONA:  For that, I will, if any other

15 parties are, want to speak to confirmation, I'll allow them to

16 do so now.

17         THE COURT:  Okay.  Very well

18         Ms. Nimeroff?

19         MS. NIMEROFF:  Good morning, Your Honor.  Jami

20 Nimeroff, subchapter V trustee.

21         Your Honor, I in my role as subchapter V trustee,

22 part of my duties are to speak to confirmation and my views of

23 confirmation.

24         Your Honor, I think where this plan has ended up as

25 compared to where things started as, you know, in terms of, I

1  would echo the comments of debtor's counsel.  I think it's a
2  dramatic improvement from where things started.

3        While it remains to be seen what the overall recovery
4  is for unsecured creditors in terms of dollars, it is a large
5  improvement from where things started in terms of backstop
6  support for it.  That is there which was not before in addition
7  to the backstop for administrative creditors.

8        Your Honor, if we just look at the confirmation
9  requirements under 1191(b), I'm not going to go through
10 everything Mr. Barsalona and his colleagues put in their brief,
11 but Your Honor for the non-consenting classes, which is the GUC
12 class, they are entitled to the fair and equitable treatment
13 which requires the devotion of three to five years of
14 disposable income.

15       Your Honor, disposable income does not in and of
16 itself allow creditors to get the benefit of capital investment
17 that is done on the way out the door.  So the 500,000 in new
18 money that is on these projections it shows the viability, you
19 know, feasibility of the projections, but that's not something
20 that unsecured creditors just get to glom onto under this test,
21 right, wrong or otherwise.  That's just the reality.

22       So I think the fact of the opportunity for guaranteed
23 recovery unsecureds is a great result here.

24       THE COURT:  So I'm not, jut to make sure I'm
25 following, I'm not at all troubled by the notion that there is

1  an exit facility that creates liquidity for the reorganized

2  debtor that doesn't translate into a recovery because the basis

3  for the recovery is the projected disposable income.  And to

4  the extent there's a capital infusion that may facilitate the

5  generation of disposable income but isn't itself disposable

6  income.  Is that, am I basically following your train of

7  thinking?

8          MS. NIMEROFF:  Yes, Your Honor.  The way I

9  understand, the way the disposable income test is supposed to

10 work is it doesn't generally contemplate the idea of a cash

11 infusion on the way out the door.

12         THE COURT:  Right.

13         MS. NIMEROFF:  And, so what creditors are really sort

14 of what they're entitled to is what would this company be able

15 to generate on its own existing equity over a three to five

16 year period.  So this is just sort of enhancement of that.  I'm

17 not saying that's not part of the record and the Court

18 shouldn't consider it, but I mean in terms of what creditors

19 are entitled to, that's not something in and of itself that I

20 believe the test contemplates.

21         Your Honor, in terms of sort of the other aspects of

22 the rule of construction for fair and equitable, you have to

23 determine that the plan largely is feasible and that the plan

24 payments will be made.  If not, there should be some default

25 provisions in here.

1        Your Honor, I do believe the record and the

2 supplemental declaration that was done will allow you to make

3 that finding.  However, there is a default provision in the

4 plan, 6.8, has sort of a backstop, if you will, to that

5 finding.  But that is in there.  And as Mr. Barsalona noted,

6 the confirmation order does contemplate the reporting that we

7 generally have in this jurisdiction in B confirmation cases.

8        So, Your Honor, with the supplemental declaration and

9 the plan supplement that contains the signed note term sheet

10 which is sort of obligates this sponsor to put in the money and

11 to do the conversion, I think that again this is a, this is a

12 really tremendous result from here to there so to speak, from

13 where we started, and I support confirmation.

14        THE COURT:  Okay.  So just, I think the record is

15 clear enough, but just so I satisfy myself, your last pleading

16 was a reservation of rights.  I take it, where you are now is

17 that reservation has been satisfied and you now support

18 confirmation.

19        MS. NIMEROFF:  Yes.  And, Your Honor, frankly at the

20 time I knew a third amended plan was coming but it hadn't even

21 been filed yet, and just given the timing of the situation,

22 yeah.

23        THE COURT:  I totally understand.  The deadline, I

24 get it.  I just wanted a clear record.

25        MS. NIMEROFF:  Yeah, absolutely.

1           THE COURT:  So I appreciate that.

2           MS. NIMEROFF:  And, Your Honor, just to make it extra

3  clear, I spent a fair amount of time with debtor's counsel and

4  Mr. Jawad about, talking about the projections, and

5  specifically asked for the supplemental declaration which I

6  think did a great job in furthering the record and in answering

7  a lot of the questions that I had.

8           THE COURT:  Got it.  Thank you very much, Ms.

9  Nimeroff.

10          MS. NIMEROFF:  Thank you, Your Honor.

11          THE COURT:  So Mr. Elroy I see you turned on your

12  camera.  Would you like to be heard with respect to plan

13  confirmation?

14          MR. ELROY:  Yes, Your Honor.  This is John Elroy of

15  Greenberg Traurig on behalf of Monomyth Sponsor Group, the DIP

16  lender.

17          Your Honor, just a clarification on the terms of the

18  exit financing.  I believe Mr. Barsalona misspoke when he

19  talked about I believe he referred to note there on the balance

20  sheet an immediate conversion.  There is, the term sheet does

21  contemplate a convertible note feature which is secured by

22  senior first lien secured obligations of the company until

23  there's a conversion event.  So I just wanted to be clear on

24  the record that that's what is contemplated.

25          THE COURT:  OKay.  Thank you, Mr. Elroy.

1        Mr. Barsalona, is that a fair statement?

2        MR. BARSALONA:  Yes, Your Honor.  And I think Mr.

3   Dunn is on the line too.  To the extent I believe the entire

4   intent in all of our discussions with the debtor have been that

5   there will be a conversion at the end of those three events.

6        THE COURT:  Okay.  All right.  I just wanted to make

7   sure, it sounds -- okay, fair enough.

8        Mr. Dunn, would you like the opportunity to be heard

9   or -- okay, I'll take that as a no.

10        MR. ELROY:  So the record is clear, Mr. Dunn is

11   [indiscernible].

12        THE COURT:  Okay.

13        MR. ELROY:  And looks like he has declined to speak

14   which is understandable.

15        THE COURT:  Fair enough.  So let me ask this first.

16   Is there any other party in interest that would like to be

17   heard with respect to confirmation on any issue other than the

18   release issue?

19        Okay.  So I don't have further questions with respect

20   to this.  I think that the parties here have done a tremendous

21   job.  I guess I do have a question about the relationship

22   between the confirmation order and the third party release

23   issue.

24        MR. BARSALONA:  Absolutely.

25        THE COURT:  If you could help with that.  So tell me

1  how dependent or separate are these issues?

2          MR. BARSALONA:  Your Honor, I believe we have a very

3  vague paragraph in the order that says these releases are

4  approved.  Whatever the ruling is today we could easily add in

5  provisions that modify what the plan does with respect to them.

6  That could be done very, very quickly uploaded today,

7  notwithstanding whatever Your Honor's ruling on that issue may

8  be.  So there's nothing that needs to be removed that is in

9  there, it just speaks generally about the releases being

10 approved in XYZ provisions --

11          THE COURT:  Okay.

12          MR. BARSALONA:  -- for the general findings related

13 to wire releases.

14          THE COURT:  All right.  So why don't I hear the

15 argument with respect to releases and then come back to the

16 question depending on where my brain is after I've heard

17 everyone out.

18          MR. BARSALONA:  Absolutely.  Would you like to hear

19 from the debtors first, Your Honor, or the objector.

20          THE COURT:  Do the parties have a preference?

21          UNIDENTIFIED SPEAKER:  Just assume hear from you and

22 then we can respond.

23          THE COURT:  All right.  Fine.

24          MR. BARSALONA:  Perfect.  So, Your Honor, let's start

25 with Purdue.  And let's talk about what it specifically carved

1  out.

2          THE COURT:  Okay.  Actually, before we do that, can

3  we start with, and I should understand this better than I do,

4  so my apologies, can we talk a bit about who are the

5  beneficiaries of the releases and the scope of the releases?

6          MR. BARSALONA:  Absolutely.  Absolutely.  So the

7  release parties include the majority of the entities related to

8  the debtor and the DIP lender, and your typical representatives

9  including officers, directors, partners, etc.  I'm glad you

10  asked that question, Your Honor, because a comment from one of

11  the now accepting parties, Monomyth, was to carve out former

12  officers and directors and founders.  And that addition was

13  added to the representatives definition in there to make sure

14  that they don't flow.

15          Why that's important, Your Honor, is because of the

16  first category, and we can go into the different categories of

17  who is actually giving the release.  And I see that as three

18  main parties -- those that voted to accept, those that are

19  presumed to accept, and those that rejected and opted out.

20          There is no release for those that threw away their

21  ballot that had the ability to vote.  So you are really hitting

22  on the unimpaired creditors in the presumed accepting classes

23  in the PTO claims and equity.  The eight parties that accepted

24  in the GUC class, the one DIP lender claim that voted to

25  accept, and then all of the parties that voted to object and

1  opted out.  And I can represent --

2        THE COURT:  Well, those who voted to reject and opted

3  out of the release, you're saying they are given the release

4  despite having opted out?

5        MR. BARSALONA:  No, no.  They all chose to opt out of

6  the release.

7        THE COURT:  Okay.  So the two parties --

8        MR. BARSALONA:  They are out, yes.

9        THE COURT:  The two parties who are given the release

10  are a) those who voted in favor of the plan.

11        MR. BARSALONA:  That's correct.

12        THE COURT:  And b) those who essentially didn't get

13  to vote on the plan because they were deemed to --

14        MR. BARSALONA:  They were unimpaired.

15        THE COURT:  They were unimpaired.

16        MR. BARSALONA:  They were presumed to accept.

17        THE COURT:  Okay.

18        MR. BARSALONA:  And they are getting all of the

19  benefits from the debtor in satisfaction of their claims.

20        THE COURT:  Okay.

21        MR. BARSALONA:  And they are coming out full at the

22  other end.

23        THE COURT:  Again, this is another thing that maybe I

24  should know if only I were better, is this a case in which

25  there were any claims actually asserted either before or during

1  the bankruptcy case?

2         MR. BARSALONA:  There were claims asserted during the

3  bankruptcy case by an entity that's no longer here, Camber.

4         THE COURT:  And whose claim has been acquired.

5         MR. BARSALONA:  Purchased.

6         THE COURT:  Right?  So it's not that they're not

7  here, they're really not here.

8         MR. BARSALONA:  Exactly.  Exactly.  And you also

9  have, there were claims of course of prepetition issues of how

10 the company ended up in bankruptcy, hence, the reason why we

11 chose to carve out.

12        THE COURT:  Pause.

13        MR. BARSALONA:  Yeah.

14        THE COURT:  I understand there are claims against the

15 debtor that brought the debtor into bankruptcy.

16        MR. BARSALONA:  Yep.

17        THE COURT:  Were there prepetition claims asserted

18 against the beneficiaries and third party release?

19        MR. BARSALONA:  No, there were not.

20        THE COURT:  Okay.  All right.  I apologize.

21        MR. BARSALONA:  Not at all, Your Honor.  And when I

22 say claims I'm speaking the general sense.  There has not been

23 any causes of action that are brought.  The company is still

24 looking into those parties that we are looking into

25 investigating.  But the entities that are the beneficiaries of

1    the release truly is Monomyth as DIP lender and its capacity as

2    DIP lender, and there is no corresponding release party should

3    I say, so those that give a release, get a release, that's not

4    happening at all.

5              THE COURT:  I understand.  Okay.

6              MR. BARSALONA:  So those are the beneficiaries.

7              THE COURT:  Okay.

8              MR. BARSALONA:  And as I said, the three categories

9    of parties that the Court needs to consider are the voted to

10   accept parties, the presumed to accept and reject and opt out.

11   And the mechanism itself, Your Honor.  And again let's start

12   with Purdue.

13             I don't understand why we are having this debate in

14   opt out consensual cases when there's an actual carve out in

15   the opinion that says specially, we are not speaking at all

16   about consensual releases.

17             THE COURT:  Correct.

18             MR. BARSALONA:  And what is deemed to be consent.

19   Therefore --

20             THE COURT:  I'll tell you why we're having the

21   conversation.  Because at least, at least in my view, so look,

22   before Purdue Pharma, there were as you know judges of this

23   Court who thought that a consensual release meant one in which

24   the person affirmatively expressed their consent.

25             I reached myself the opposite conclusion.  I said

1  that opt outs were okay, but in explaining why I thought they
2  were okay, it's because at least in part because of the ability
3  -- the question, one way of thinking about it is the very
4  thoughtful opinions, you know, in Wamu and in Emerge (phonetic)
5  by my colleagues say consent, the way to think about consent is
6  a contract.  And we don't say someone is bound by a contract
7  because they got an offer to which they didn't respond.  The
8  way you say they've consented is an offer of an acceptance.
9  That's a perfectly fair way of thinking about it.

10       Now, I came to a different conclusion which is you
11 got notice, you had the opportunity to speak up about it, you
12 chose not to and that's, I can infer your consent from your
13 failure to respond.  But the question is what is your, what is
14 the basis to impose on someone an obligation to respond.

15       And I found that there was a basis to impose an
16 obligation to respond  in a world in which there were non-
17 consensual releases.  It's just like a plan term like any other
18 plan term.  You can like it or not like it, but it's a
19 plausibly legal term, at least it was in this jurisdiction
20 because of Continental.  And if you're unhappy with a plausibly
21 legal plan term, you've got to show up and say so.

22       And so to me the reason we're having this
23 conversation after Purdue is because there's no longer a
24 plausibly lawful basis to do this to someone without their
25 consent.  And that to me gives rise to at least the question,

1 what is our basis to impose on them their obligation to speak

2 up if they don't want it.

3          So that's, that doesn't answer the question, but I

4 think it answers at least your question as why we are having

5 this discussion.  I do think Purdue is not irrelevant to the

6 question of opt in versus opt out.

7          MR. BARSALONA:  I would agree with that, Your Honor.

8 I would turn to the 1141 super contract that you also spoke

9 about in Arsenal.  All of that logic and reasoning remains

10 undisturbed in that when there's prominent and conspicuous

11 notice given to each and every one of these parties, that they

12 can object to the releases.

13          THE COURT:  So, Mr. Barsalona, what is the limit to

14 that principal?  Imagine, imagine the plan said every creditor

15 is required to you know deliver a $50 check to the debtor's

16 CEO.  And that's what the plan said, it was conspicuous and it

17 was prominent.  And it went out and people didn't respond.  Is

18 that a legally enforceable obligation?

19          MR. BARSALONA:  If it comes under the bankruptcy

20 code, right?  And again there is no decision yet on whether or

21 not consensual releases are within 1126.  There's still no

22 opinion about that at the higher court level.  And --

23          THE COURT:  Right.

24          MR. BARSALONA:  Again, if that has already been

25 deemed to be consent under Indianapolis Downs that people have

1  done time and time again, right.

2            THE COURT:  I understand.

3            MR. BARSALONA:  Then how, how does that change the

4  nomenclature?  How does that change anything that we have done

5  previously where we have asked for creditor consent?  And

6  again, let's look at this case.

7            THE COURT:  In fairness, <u>Indianapolis Downs</u> is one

8  perspective, right, and --

9            MR. BARSALONA:  Yes.

10            THE COURT:  And there other opinions of this Court

11  that have come out the way.

12            MR. BARSALONA:  Yes.  So let's specifically, and

13  honestly, Your Honor, the opt out parties for purposes of what

14  we're talking about, it's like we said, the mechanism worked.

15  Because every single party that rejected --

16            THE COURT:  I understand.

17            MR. BARSALONA:  -- opted out.  We didn't choose

18  anyone, you know, they had to opt out, no matter what they'd be

19  deemed to do it.  In this particular case, if you chose to vote

20  to reject so you're actively looking t your ballot, then you

21  also have to op out to not do it, and each of those three did

22  that.

23            THE COURT:  And I take it that creditors who voted in

24  favor of, there was no choice here to say, I support the

25  treatment of my claim, but I want to hold on to my right to sue

1  third parties.  That option wasn't given to folks.  Right?

2          MR. BARSALONA:  They could object to the plan.  They

3  could object to the plan.

4          THE COURT:   They could object to the plan.  But

5  could they vote in favor and say, if you think that what voting

6  is, there's at least a view to this end, that what the vote is

7  fundamentally about is the treatment of that class of claims.

8  Could you say I'm fine with the 100 and some thousand dollars

9  that are going here to general unsecureds, I'm good with that,

10 so I have no problem with the treatment of my claim.  But as to

11 my, the claim that I have against the third party, there I'd

12 like to hold that, please.  Do they have a way to accomplish

13 that?

14         MR. BARSALONA:  Absolutely.  Look at what Monomyth

15 did.  Look what Monomyth did because they --

16         THE COURT:  Oh, you could vote in favor --

17         MR. BARSALONA:  -- did not, so they didn't vote.  To

18 Correct Mr. Jaffe's record, they did not vote to reject and

19 flip their vote, they didn't vote at all.

20         THE COURT:  Okay.

21         MR. BARSALONA:  They didn't vote at all.  And then

22 when it was time to come to the deal they said we need to carve

23 these individuals out and then we can vote in favor of the

24 plan.

25         THE COURT:  I see.

1          MR. BARSALONA:  So the individuals, the eight of the

2    GUC class that voted to accept had the same rights around them,

3    we would hit them over the head with every single iteration of

4    the plan since May.  We served the plan itself out on literally

5    the entire creditor matrix which is not required, but we did

6    that to make sure that we had prominent and conspicuous notices

7    as your Court, as Your Honor has required previously.  And we

8    continued to do it.  And those that are presumed to accept that

9    are unimpaired, so they're living with the PTO that's going to

10   be paid in full as well as the equity that's getting, that's

11   retaining all of their interests.  Right?  They're the ones

12   that are unimpaired that are deemed to give these releases.

13         We made sure we were very vocal with those that have

14   reached out to us, that spoke about it, that had asked

15   questions about the releases.  That shows the process works,

16   that the mechanism works, that people that are involved in this

17   case and receiving these types of notifications are reaching

18   out to the proper people to voice their concerns if necessary,

19   and we listened.

20         THE COURT:  Okay.

21         MR. BARSALONA:  And we didn't jam anything down

22   people's throat.  So in that sense, Your Honor, the classes we

23   really care about and want to leave undisturbed as we believe

24   Purdue does, are those that voted to accept the plan to get the

25   release in accordance with all this Court's case law.

1 _Washington Mutual_ itself said mechanism voting of the plan

2 works, _Spansion_, _Quorum_, _Exide_, those are all vote to accept

3 give the release.

4         And with respect to the presume to accept, again,

5 this falls within _Arsenal_'s logic and reasoning as well as

6 _Indianapolis Downs_ and other opinions as well that we think

7 leave undisturbed.

8         And for that, Your Honor, we believe that the release

9 provisions are appropriate and valid here.

10         THE COURT:  Okay.  Thank you, Mr. Barsalona.

11         Mr. Cudia?

12         MR. CUDIA:  Thank you, Your Honor, Joseph Cudia for

13 the United States Trustee.   I'm here with my colleague, Ms.

14 Sierra Fox.

15         And as an initial matter, I want to thank debtor's

16 counsel for working with us to narrow down the issues.  Also

17 too, the portion of our objection regarding the plan as a

18 settlement, the former 6.9, was eliminated from the third

19 amended plan which was filed shortly after we filed our

20 objection.  And also the definition of representatives was

21 narrowed.  We thank them for that.

22         I also want to recognize the additional commitment

23 from the plan sponsor that does add some money to the pool for

24 general unsecured creditors.

25         We object to the confirmation of the plan because

1  it's our position that it provides for non-consensual third

2  party releases.  In other words, non-debtors releasing non-

3  debtors, and the injunction to enforce those releases.

4          Since the Supreme Court ruling in <u>Purdue Pharma</u>

5  prohibits non-consensual releases as lacking support in the

6  Bankruptcy Code, we believe it makes sense to reexamine what

7  qualifies to demonstrate consent to such releases for reasons

8  we will discuss.

9          Basically our objection breaks down to four parts.

10 That the plan as proposed forces holder of claims that are

11 deemed to accept such as those classified unimpaired where they

12 have to grant the third party release without their assent of

13 any form, not even an opt out.

14         THE COURT:  Let's slow down, slow down.

15         MR. CUDIA:  Yes.

16         THE COURT:  So this category is those who vote in

17 favor?

18         MR. CUDIA:  No, those that are unimpaired.

19         THE COURT:  Unimpaired.  So if an unimpaired creditor

20 had filed an objection to the plan and said, I object to the

21 plan because the third party, because I oppose the third party

22 release, wouldn't that have been a mechanism to protect their

23 ability?  There, the debtor would have basically had no choice,

24 right, unless they wanted to argue that this was a permissible

25 non-consensual release which is a [indiscernible] in light of

1  Purdue Pharma, they would have had to cut them out.  Right?

2            MR. CUDIA:  Um-hum.

3            THE COURT:  So the difference between what happened

4  here and what you would like is they weren't given a piece of

5  paper that said expressly check this box.

6            MR. CUDIA:  They were not.

7            THE COURT:  They could have filed a plan objection.

8            MR. CUDIA:  They were not given the opportunity to

9  separately assent to this, and I'll get to that a little bit,

10 but yes.

11           THE COURT:  Right.  I understand.  Okay.  And do we

12 have a ballpark universe of how many people we're talking about

13 here?

14           MR. CUDIA:  It's any administrative claimant.  There

15 are some priority tax claims if I recall correctly.

16           THE COURT:  Okay.  So priority claimants and the

17 administrative.  The classes that are unimpaired here are only

18 basically priority claims, right, admin claims, the priority

19 tax claims, etc.

20           MR. CUDIA:  Well, in this case, equity also.

21           THE COURT:  And equity is unimpaired.

22           MR. CUDIA:  Yes.

23           THE COURT:  Okay.  Fair enough.

24           MR. CUDIA:  That the plan as proposed forces holder

25 of claims that vote to accept the plan to grant the third party

1  release without their separate assent, again, of any form to

2  the third party releases.

3       And that the plan as proposed requires those to vote

4  to reject the plan to separately indicate that they do not

5  consent to grant the third party releases.

6       And then, of course, that the plan's form of

7  indicating consent of an opt out mechanism is not a true

8  indication of consent to the releases.

9       Of course, as we're all aware of the U.S. Supreme

10 Court in Purdue Pharma held that non-consensual third party

11 releases are not authorized under the bankruptcy Code.  As

12 such, it follows that the holder of a claim must manifest

13 assent at least in some fashion to the granting of a third

14 party release.

15      A claim or an interest holder such as an unimpaired

16 claimant who is not voting is not given the opportunity to

17 manifest that assent in any way cannot be said to consent to

18 the third party release.  There's no exception in Purdue for

19 those that will eventually be paid in full.

20      THE COURT:  Well, there is that funny language in

21 Purdue that I'm not sure I understand that talks about the

22 category of paid in full cases, right.

23      MR. CUDIA:  Yes.

24      THE COURT:  So you have to give that some meaning,

25 right?

1            MR. CUDIA:  Certainly.

2            THE COURT:  Do you have a theory for what meaning we

3   ought to give it?

4                      (Laughter)

5            MR. CUDIA:  No.  I read the recent article in ABI and

6   I have to confess I still don't understand it.

7            THE COURT:  All right, well, we're on the same page

8   there.

9            MR. CUDIA:  In their confirmation brief at paragraph

10  72, the debtor cites to Indianapolis Downs for the premise that

11  unimpaired claimants "consent" to the releases, talking about

12  consideration for those releases.  And the Court in Spansion

13  says basically the same thing.

14           Post Purdue as it pertains to a third party release,

15  the consideration is immaterial, it's either consensual or it's

16  not, nor does reasonableness, fairness [indiscernible] nor do

17  they have any merit as far as they're the Continental

18  standards.  None of that matters anymore.

19           That's exactly why a reexamination of these issues is

20  warranted post Purdue.  Many earlier decisions are partially

21  Based on a prior availability of non-consensual third party

22  releases for Continental.  And further, 1124 provides that a

23  creditor is unimpaired if a plan leaves unaltered the legal,

24  equitable and contractual rights to which such claim or

25  interest entitles the holder of that claim or interest.  Having

1  to grant a third party release is an impairment as it does not

2  leave the creditor in the same position, as the same rights as

3  they had before the case.

4          THE COURT:  So can I ask a really annoying question?

5  So, look, as I think my questions to Mr. Barsalona may have

6  revealed, I think this is a hard question.  I don't know for

7  certain what I think about whether it's appropriate to impose

8  on a creditor the obligation to opt out after Purdue Pharma as

9  to whether if it wants to keep its claim, the way I frame the

10 issue, this particular issue is whether the code authorizes us

11 to impose on a creditor who wants to keep the claim, the

12 obligation to speak up if it just wants to keep its claim

13 against non-debtor parties.  I think that's a difficult

14 question after Purdue Pharma.

15         All things being equal, if I got to choose how I do

16 my job, I'd resolve that when someone comes to me with a

17 solicitation motion before the, you know, cake is in the oven,

18 and rather than deal with it after the fact.  And I'm not,

19 ruling your way here wouldn't unravel anything, I don't want to

20 overstate it, but if I had, if it were up to me, I'd come back

21 to this in that context.  I'm not blowing off your argument in

22 the least.  To the contrary, I'm concerned about it.  But I

23 feel like there's some element.

24         Purdue Pharma put everyone on notice, we all, you

25 know, the law is when it's made by judges, is done

1 retroactively, it's done by we've reached decisions in

2 particular cases and they have effect to the parties in the

3 case.  So that's just the nature of the judicial process.  So

4 I'm not saying we should do anything prospectively only.

5          That said, we would minimize the, if, look I wrote a

6 decision in <u>Arsenal</u> that there are, if it turns out that <u>Purdue</u>

7 <u>Pharma</u> requires us to revisit what we've, how we've been

8 thinking about it, it feels to me for the good of the system

9 doing that in connection with a solicitation motion would be

10 less disruptive than doing it here after the plan is already

11 otherwise done.  Now, you can say, well the debtors could have

12 filed a solicitation motion, I guess that would be a fair

13 response.

14          But I'm just asking from your perspective, I mean

15 this is a sub V case, we're talking about relatively smaller

16 amounts.  How grave an injustice would it be if the answer were

17 under the circumstances here, I'm going to conclude that this

18 was consensual, but it's entirely without prejudice to the

19 ability to rethink this the next time it comes down the pike in

20 a way in which whatever ruling I would make would not be as you

21 know, in which it would effectively prospective rather than

22 retroactive?

23          MR. CUDIA:  Well, I can answer that.  I guess there's

24 a couple of questions there.

25          As far as the first, I can understand your position

1  as better dealt with at solicitation.  In this case, we had

2  <u>Purdue Pharma</u> be decided --

3         THE COURT:  In between.  I understand.  And look, I

4  also understand that there are times when you get here at

5  solicitation and judges yell at you and say, that's a

6  confirmation issue.  So you lose both ways.  So I'm not, I'm

7  trying to be fair to you.

8         MR. CUDIA:  I was going to go to that too.

9         THE COURT:  Okay.

10        MR. CUDIA:  As far as what my client's position would

11 be as far as that kind of ruling, I can't really say, we didn't

12 really discuss that specifically.

13        THE COURT:  That's fair enough.  That's a perfectly

14 fair answer.

15        MR. CUDIA:  But, yeah.  So at least as far as parties

16 that vote to accept the plan, again, as I indicated, they must

17 be given the opportunity, separately manifest dissent to those

18 releases.  The claim holder might not understand the

19 implications.

20        And it's out position that it's not true consent to

21 extort from a third party release from a claim holder as a

22 requirement of voting in favor of its treatment under the plan.

23 Not here, but in a typical chapter 11 plan, in accepting non

24 [indiscernible] class is required for a plan to be confirmed.

25 And a vote to reject may sink a plan and result in worse

1  treatment of its claim than whatever it would have gotten which

2  is typically less than they originally bargained for when they

3  made the deal.

4          THE COURT:  And so what's your response to Mr.

5  Barsalona's pretty clever response to that point, which is

6  well, look, look at what the DIP lender did here, there was a

7  mechanism that allowed you essentially to vote yes, but you

8  know not have a third party release you didn't like and that

9  was available to everyone, and isn't that good enough?

10         MR. CUDIA:  I don't think after Purdue it's good

11 enough.  I think they need to, they need to actually separately

12 assent to the release.

13         THE COURT:  Am I right that none of my colleagues

14 have addressed this question after Purdue?

15         MR. CUDIA:  I don't believe they have here.  There

16 are some --

17         THE COURT:  And what did I do to make you all mad to

18 bring it to me first?

19                         (Laughter)

20         MR. CUDIA:  There are a few other decisions that have

21 happened.  I know of one in New Jersey where it found opt out

22 was good.

23         THE COURT:  Yeah.

24         MR. CUDIA:  I know the Judge in Ebix case in Northern

25 District of Texas glowingly cited Arsenal right up to the point

1 where he found that [indiscernible] are required.

2          THE COURT:  Right.

3          MR. CUDIA:  But, again, it's a very sparse record

4 even outside this district.

5          THE COURT:  Okay.

6          MR. CUDIA:  And, again, on that same subject, the

7 holder of a claim deprived of any right they might have to

8 recover on their claim is not necessarily receiving more than

9 they would receive under chapter 7 liquidation depending on

10 what rights they might have had against a third party.

11          Parties that vote to reject should not have the added

12 burden of checking an additional box to avoid granting releases

13 contained in a plan that they already rejected.  Strain

14 credulity to conclude that the holder of a claim that voted to

15 reject the plan would assent to granting the releases contained

16 within.

17          And the court in Classics Holdings (phonetic) as they

18 noted, that it's little more than a court endorsed trap for the

19 careless or inattentive creditor.

20          In voting to reject the plan, the claim or interest

21 holder has already indicated they do not support the treatment

22 they are receiving.  And if parties who vote to accept or deem

23 to consent to the releases contained within, the same logic

24 would apply to those that vote to reject including if they had

25 rejected the whole plan.

1          All right.  Now, on the subject of opt in and opt

2   outs.  Again, it's been the longstanding position of the United

3   States Trustee that a holder of a claim must opt in to

4   affirmatively provide the required assent to grant third party

5   releases.  The ruling at Purdue Pharma and its holding that

6   non-consensual third party releases are not permitted demands a

7   reexamination of how such assent can be manifested.

8          Again, I won't go through, you're certainly, the

9   Court is certainly aware of the decisions of judges in this

10  Court that have found that an opt out is not appropriate.

11         Of course, as Purdue instructs, a bankruptcy court is

12  not endowed with the power to extinguish without consent claims

13  held by non-debtors against other non-debtors.

14         And those courts that have found that an opt in is

15  required, often look to basic contract principals for guidance.

16  Regardless of any conspicuous warnings on the solicitation

17  materials, they find that no duty arises for a claim holder to

18  speak.  And of course, again, as I'm sure that the Court is

19  aware, basic contract principals that are silenced in an action

20  generally cannot be deemed as assent except in limited

21  circumstances which are not present here.

22         Here, we have a, a creditor can expect to have their

23  rights impacted as far as the debtor.  Post Purdue, a plan can

24  no longer contain a consensual, a non-consensual third party

25  release so that a creditor cannot be expected to anticipate

1  that his rights may be impacted with respect to a third party.

2  And as far as understanding the plan, a possible exception of

3  the largest unsecured creditor just doesn't make sense for a

4  lay creditor to hire counsel to interpret the plan, the ballot

5  and their implications.

6       Again, in the Third Circuit we have <u>Continental</u> which

7  did hold that non-consensual releases were permitted at least

8  under some limited and demanding circumstances.

9       THE COURT: That's now water over the dam.  But

10 whether that's a holding or not is actually a pretty

11 interesting question.

12      MR. CUDIA: Yes.  All right.  The earlier cases were

13 decided with a backdrop of non-consensual third party releases

14 being permissible under certain circumstances.  After post

15 <u>Purdue</u> which now requires a separate consent to the third party

16 release, third party release should be looked at as a separate

17 contract between the creditor and third parties.  Well,

18 actually between third parties -- non-debtor, the creditor and

19 third parties, not the debtor.  Which require an affirmative

20 consent like any other contract.

21      Since it requires a separate consent from the rest of

22 the plan, it should not be looked at as a plan provision to

23 which a creditor is bound upon confirmation pursuant to 1141.

24      In other places in the Code, the Court has given the

25 authority to value, you know, to value claims, cure amounts,

1  even without consent.  Those adjudications remain between the

2  debtor and the creditor.

3          Your Honor, it's the position of the United States

4  Trustee that any holder of a claim from which the debtor wants

5  a third party release per the holding of Purdue Pharma, that

6  holder must assent to that release.  All classes of creditors

7  that the debtor proposes grant the party release must be given

8  the opportunity to show that they consent.  And it is the

9  position of the United States Trustee that only an opt in

10 arrangement assures that the holder truly assents.

11         We ask the Court to deny confirmation of the plan so

12 long as it contains the non-consensual third party release and

13 the injunction that supports it.

14         THE COURT:  Okay.  Thank you.

15         Mr. Barsalona?  So I want to be practical for a

16 moment.  Look, I think my wish that I could not resolve this in

17 this case, I don't see a way to get from here to there.  This

18 is a hard question.  You in the meantime have a smallish

19 business and a debtor that needs to get out of bankruptcy.  Is

20 there a way to submit a confirmation order that in which I

21 confirm a plan and reserve on the scope of the release and give

22 this further thought?

23         I don't mean to be dilatory, but I want to be

24 pragmatic.

25         MR. BARSALONA:  Right.

1          THE COURT:  You heard me thinking out loud trying to

2     say can I save this for another case persuading myself that

3     that would be nice but lawless.

4                         (Laughter)

5          THE COURT:  So I don't think that's one of my

6     options.  So in a world in which I have to decide it, and I

7     don't think I'm going to decide it like from the bench, and so

8     is there a way to get through the day that saves the company

9     and allows me to figure this out?

10         MR. BARSALONA:  Absolutely, Your Honor.  And I'm

11    rushing to try to find the paragraph that speaks about

12    releases.  And what my idea would be is that paragraph itself

13    would be -- thank you, Jill -- it's O, and there could be a

14    corresponding numbered paragraph, but either each release

15    paragraph we'll put reserved and we'll put a footnote saying

16    reserved for further determination by the Court, so that we can

17    enter an order today and then depending on --

18         THE COURT:  Let me turn to the U.S. Trustee.  Is

19    proceeding in that fashion acceptable to your office?  Because

20    we're no longer in a world of necessity, right, it's just about

21    what counts as consent, so they don't, the world in which they

22    had to, they rose or fell together I think is behind us.

23         MS. FOX:  Your Honor, Rosa Sierra Fox on behalf of

24    the U.S. Trustee.  And I don't mean to trample on my colleague,

25    we rarely get to collaborate, so this is one of those

1 instances.

2         I think Your Honor is correct on the assumption that
3 the debtor agrees that they don't, the parties on the table
4 with respect to this plan don't need these releases or demand
5 these releases to fund, get whatever funding is in place.

6         THE COURT:  Exactly.  That's the necessity issue
7 that's behind us.

8         MS. FOX:  Yeah.  And that would be --

9         THE COURT:  So can I suggest that the parties meet
10 and confer and settle an order under certification that
11 basically carves this out?  We'll enter that order as soon as
12 it comes through.  I'll take under advisement the good and
13 complicated issue presented.  I'll get it decided as quickly as
14 I can, but not so quickly that I make a mess of things.

15         MR. BARSALONA:  Absolutely.

16         THE COURT:  Agreeable to the U.S. Trustee?

17         MR. CUDIA:  Yes, Your Honor.

18         THE COURT:  Okay.  That's how we'll proceed.

19         MR. BARSALONA:  With that, Your Honor, that's all we
20 have today.

21         THE COURT:  Okay.  Let me ask this.  Is there any
22 other party in interest that would like to be heard with
23 respect to any other matter?  Any other way in which the Court
24 can be helpful to the parties?  Okay, if not -- let me go back
25 because we never got a chance to say this.

1          The good and hard work that was done by everyone on

2   the core issues on the case about reorganizing this company and

3   coming up with a mechanism to salvage the business and treat

4   creditors fairly and appropriately was terrific work by

5   everyone.  And I want to thank all of the professionals, the

6   underlying business folks.  I appreciate that there was

7   compromise all around.  I want to really express my thanks to

8   the subchapter V trustee who clearly has played the role that

9   the statute contemplates in making it possible to save these

10  businesses and respect principles of bankruptcy laws.  So

11  really do appreciate everyone's good and hard word and don't

12  want that to be lost.

13          There is a complicated other issue, but that in the

14  scheme of things, you know, shouldn't cause us to lose sight of

15  the really good work that everyone has done here.

16          So let me thank you for all of that.  I'm delighted

17  to enter that order, and we'll do so as soon as it comes

18  through under certification.  I'll then figure out the answer

19  to this other question to the best of my abilities, and we'll

20  take it from there.

21          So with that and really my thanks to everyone, we're

22  adjourned.

23          ALL:  Thank you, Your Honor.

24              (Proceedings adjourned 11:00 a.m.)

25                      * * * * *

47

1                           CERTIFICATION

2          I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter to the best of our knowledge and ability.

5

6    /s/ Theresa Pullan                    September 5, 2024

7    Theresa Pullan, CET-780

8    Certified Court Transcriptionist

9    For Reliable

10

11

12

13

14

15