## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>SMALLHOLD, INC.,<br><br>     Debtor. | Chapter 11<br><br>Case No. 24-10267 (CTG)<br><br>**Related Docket No. 250** |

## <u>MEMORANDUM OPINION</u>

In its recent decision in *Purdue Pharma*, the Supreme Court held that the Bankruptcy Code does not authorize bankruptcy courts to confirm a plan of reorganization that provides for the release of a creditor's claim against a non-debtor.[1] That holding, however, was expressly limited to *nonconsensual* third-party releases. The Court made clear that "[n]othing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan[.]"[2]

The law in this jurisdiction before *Purdue Pharma* permitted nonconsensual third-party releases in exceptional cases.[3] But at least in this Court, such cases truly were exceptional.[4] *Consensual* releases, on the other hand, are commonplace. The

---

[1] *See Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024).

[2] *Id.* at 2087 (emphasis in original).

[3] *See generally In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000).

[4] Indeed, the 24 years between *Continental* and *Purdue Pharma*, the undersigned judge is aware of only five cases in the District of Delaware in which courts confirmed plans of reorganization providing for nonconsensual third-party releases. *See In re Millennium Lab Holdings II, LLC,* Doc. No. 195 (Bankr. D. Del. Dec. 14, 2015); *TK Holdings Inc.*, No. 17-11375, D.I. 2109-3 (Bankr. D. Del. Feb. 20, 2018); *In re Weinstein Company Holdings*, No. 18-10601, D.I. 3203 (Bankr. D. Del. Jan. 26, 2021); *In re Mallinckrodt PLC*, 639 B.R. 837, 866

judges of this Court, however, have long expressed differing views on what constitutes consent. Some opinions have adopted a "contract" model, concluding that a finding of consent required an affirmative indication that the creditor consented to the release.[5] To comply with this view, a creditor was typically required affirmatively to check a box on its ballot indicating that it intended to "opt in" to the third-party release. Others have taken the opposite view, concluding that so long as the creditor was clearly and conspicuously informed that the failure to "opt out" would operate a release of third-party claims, such a release would be effective against any creditor that did not check a box to "opt out" of the third-party release.[6]

The undersigned judge had previously approved of "opt out" third-party releases.[7] But the reason this Court reached that conclusion can be described as a "default" theory. Under *Continental*, whether a *nonconsensual* third-party release could or could not be imposed on an objecting creditor depended on the evidence the debtor brought forward at the confirmation hearing. The *possibility* that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing. In this sense, the third-party release was a contestable plan provision like any other –

---

(Bankr. D. Del. 2022); *In re Boy Scouts of America and Delaware BSA, LLC,* 642 B.R. 504, 588 (Bankr. D. Del 2022).

[5] *In re Washington Mutual, Inc.,* 442 B.R. 314, 352 (Bankr. D. Del. 2011); *In re Emerge Energy Services, L.P.,* No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019).

[6] *See In re DBSD North America, Inc.,* 419 B.R. 179 (Bankr. S.D.N.Y. 2009).

[7] *See In re Arsenal Intermediate Holdings, LLC,* No. 23-10097, 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023).

including one that set the cure amount for a thousand assumed contracts at $0. Creditors who are validly served with a plan and who take issue with the proposed cure amount or the third-party release are required to speak up.  And a creditor who does not speak up can be "defaulted."  Once the plan is confirmed, the $0 cure amount will be binding on the creditor.  And so would (at least before *Purdue Pharma*) the third-party release.   The failure to opt out, and thus to allow entry of the third-party release to be entered by default, could be described as the creditor's "consent" to that third-party release.

This Court thus viewed the practice of providing a ballot with a box affording the creditor the opportunity to "opt out" to be a matter of administrative convenience. In the absence of this kind of ballot, such a creditor could be required to file an objection to the plan on the ground that the high standard established by *Continental* for nonconsensual third-party releases was not met, and that the plan was therefore unconfirmable.  If the creditor filed such an objection, the debtor would carve that creditor out of the third-party release, which would then be enforceable only against those creditors who did not raise an objection – those who "consented" to it.  The practice of including a box on creditors' ballots to check if they objected to the release was just an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection.

But that analysis is no longer viable after *Purdue Pharma*.  Under established principles, courts in civil litigation will enter default judgments against defendants only after satisfying themselves that the relief the plaintiff seeks is relief that is at

least potentially available to the plaintiff in litigation. Where it is clear that the complaint seeks relief that is unavailable as a matter of law, a court should not enter a default judgment under the ordinary application of Civil Rule 55.

After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by "default" in the absence of an objection. It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment. The *nonconsensual* third-party release is now *per se* unlawful. As such, it is not the kind of provision that would be imposed on a creditor on account of that creditor's default.

And in the absence of the default theory of "consent," no other justification for treating the failure to "opt out" as "consent" to the release can withstand analytic scrutiny. Some of the decisions that have authorized the opt-out approach but have not relied on the "default" principle have instead suggested that a creditor's consent can be inferred from the fact that the creditor received clear and conspicuous notice of the release and was given the opportunity to opt out of it. But aside from a context in which a default may properly be entered, there is no other context in which *that* kind of consent provides a lawful basis for separating someone from their own legal rights. That theory of consent simply proves too much. It would authorize courts to impose on creditors "consensual" obligations to which no court would subject a party in the absence of an affirmative expression of consent. Before such an obligation may

be imposed, the law would typically require the creditor to provide some affirmative indication that the creditor agrees to the terms at issue.

Imagine that Party A, after hitting Party B's car in the parking garage, wrote a letter to Party B, stating that unless Party B responded to the letter in 10 days, Party B would be obligated to release any claim she might have against Party A in exchange for a payment of $100. No court would treat Party B's failure to respond as "consent" to those terms in a way that bound Party B to release her claim against Party A. Treating the failure to check a box on a ballot in bankruptcy is no different. Consider, for example, a plan of reorganization that provided that each creditor who failed to check an "opt out" box on a ballot was required to make a $100 contribution to the college education fund for the children of the CEO of the debtor.[8] Just as in the case of Party A's letter to Party B, no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution. But none of the cases that authorizes the opt-out third-party release provides any limiting principle that would distinguish the third-party release from the college education fund plan. And after *Purdue Pharma*, there is none.

The plan now before the Court involves some interesting wrinkles. It does not purport to impose a release on a creditor who received a ballot and failed to return it. There are only two categories of creditors who would be bound. First are creditors

---

[8] Because this Memorandum Opinion will make repeated reference to such a plan, this hypothetical plan is referred to as the "college education fund plan."

who did not receive a ballot at all because they are being paid in full under the plan and are thus deemed to accept it without having to vote.  The Court appreciates that *Purdue Pharma* expressly left open the question whether creditors whose claims are satisfied in full under a plan may be subject to a release.  But even if such a release may be imposed in an appropriate case, the argument for such a release is not sufficiently developed by the parties here to warrant its imposition.

The second category of creditors that are deemed to grant the release are those who voted in favor of or against the plan and did not opt out.  These creditors were clearly and conspicuously informed that voting on the plan (whether the creditor voted to accept or reject it) would constitute a release *unless* the creditor opted out.  These creditors were provided a simple opt-out tool on the ballot.  The Court is satisfied that under these circumstances, the affirmative act of voting, coupled with clear and conspicuous disclosure and instructions about the consequences of the vote and a simple mechanism for opting out, is a sufficient expression of consent to bind the creditor to the release under ordinary contract principles.  So these third-party releases, unlike those that the plan purports to impose on creditors who were paid in full and thus did not vote and never made any affirmative expression of consent, may properly be enforced.

This Court is sympathetic to the *policy* argument in favor of the broader form of opt-out releases.  They help achieve the objective of finality and closure, which is an important bankruptcy value.  But one could say the same thing about the nonconsensual third-party release as applied to the rare case in which it is critical to

the debtor's reorganization.  *Purdue Pharma*, however, holds that the text of the Bankruptcy Code does not authorize the nonconsensual third-party release.  And after that decision, there does not appear to be a principled basis for authorizing "opt out" third-party releases in cases like this one, even if such releases might be supported by strong policy arguments.

Even so, it bears note that the sky is not falling.  There are important ways in which the bankruptcy policies in favor of finality can still be achieved after *Purdue Pharma*.  That decision does not affect the practice of exculpation of estate fiduciaries (which is expressly authorized by Third Circuit precedent) or prevent a debtor in appropriate circumstances from releasing estate causes of action, which under Third Circuit law would eliminate veil-piercing liability.[9]  The narrower form of opt-out plan, like the debtor provided here for general unsecured creditors, is also permissible.  And this Court does not foreclose the possibility (offered in a recent article) that a different outcome on the opt-out question might be appropriate in a case in which the plan process itself builds in the protections of Rule 23(b)(3), under which a named representative is authorized to act on behalf of a class, subject to the rights of unnamed members to receive notice and opt out.  For purposes of today's ruling, however, the Court does conclude that after *Purdue Pharma*, in a case like the one now before the Court, a creditor cannot be deemed to consent to a third-party release without some affirmative expression of the creditor's consent.

---

[9] *See In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014).

## Factual and Procedural Background

Smallhold is a Brooklyn, New York-based specialty mushroom farming company.[10]  Using patented technology, Smallhold's indoor mushroom farms produce ecologically sustainable organically grown mushrooms in specialty varieties.  The company's founders started the business in 2017 with, according to the first-day declaration, "a mission to provide an ecologically sustainable product while building direct connections with mycophiles, artists, farmers, ranchers, and others looking to celebrate fungi, build soil fertility, and grow their own food and plants."[11]  Its products, including a mushroom pesto, are available in over 500 locations across ten states.[12]  The debtor's founders sold their shares to Monomyth, which had been a minority investor, in February 2024.[13]

Smallhold filed for bankruptcy, under subchapter V of chapter 11, later that month.  The debtor concluded that it had grown its operations (which included mushroom farms in Brooklyn, New York; Austin, Texas; and Los Angeles, California) faster than customer demand would support.  Over the course of its bankruptcy case, the debtor rejected several leases and closed a number of its farms.[14]  Monomyth

---

[10] Smallhold, Inc. is referred to as "Smallhold."

[11] D.I. 8 at 2.  The Court relies on the first-day declaration in this context simply for background.  None of the facts that bear on the issues decided in this Memorandum Opinion is contested by the parties.

[12] *Id.*

[13] *Id.* at 4.  Monomyth, LLC is referred to as "Monomyth."  Monomyth, which also provided a DIP loan to the debtor during this bankruptcy case, *see* D.I. 95, 129, is also referred to at times as the "DIP lender."

[14] D.I. 78, 138.

sought to retain its equity interest in the debtor.  The debtor, however, received a competing offer from another entity that expressed interest in acquiring the debtor out of bankruptcy.  The debtor then received an improved proposal from Monomyth.[15] After extensive negotiations, which included the debtor's independent directors and the subchapter V trustee, the debtor ultimately proposed a third amended plan of reorganization that reflected the terms of its agreement with Monomyth.  Save for the question of the third-party releases, all parties agree that the third amended plan is otherwise confirmable under § 1191(b) of the Bankruptcy Code, as the debtor will be contributing all of its projected disposable income for a five-year period towards the repayment of creditors.

Accordingly, the only contested issue at the August 22, 2024 confirmation hearing was the question of the plan's third-party releases.  To that end, at the time the debtor filed its amended plan on June 3, 2024 (more than three weeks before the Supreme Court's *Purdue Pharma* decision), the debtor filed a certificate of counsel, which represented that the debtor, "in consultation with the Office of the United States Trustee … [has] prepared a proposed form of order [governing the plan solicitation process]."[16]  The certificate of counsel expressly stated that the Office of the U.S. Trustee did not object to the debtor's proposed solicitation order.[17]

---

[15] That entity Kapital Partners Holding, LLC, along with its affiliate, Kapital I, LLC.

[16] D.I. 181 at 2.

[17] *Id.*

That proposed solicitation order attached a form of notice of the confirmation hearing that would be sent to all creditors.  That notice clearly and conspicuously disclosed (in bold print) that: "all persons … who voted to accept this Plan or who are presumed to have voted to accept this plan and [all persons] who voted to reject this Plan but did not affirmatively mark the box on the ballot to opt out of granting the releases provided under this Plan … shall … forever release … the Released Parties of … all … causes of action … based upon any … act, omission[,] occurrence, transaction or other activity … arising  … prior to the Effective Date … relating to …. the Debtor [or] the Debtor's prepetition operations."[18]  The notice goes on to explain that released parties include, among others, "representatives" of the debtor (which term was originally defined to include all present and former directors and officers – although it was explained to the Court during the argument that through negotiations with the DIP lender, former officers and directors of the debtor were carved out of that definition), as well as the DIP lender and its "representatives."[19]

The proposed order also contained forms of ballot for creditors in each of the two classes.  The ballots to be sent to creditors in Class 1 (a class that included only one creditor — the DIP lender) indicated that "[p]ursuant to the Plan, if you return a Ballot and vote to ACCEPT the Plan, you are automatically deemed to have accepted

---

[18] D.I. 181-1 at 14 of 34.  Describing the disclosure as "clear" may be too charitable.  As is customary, the release language is written in legalese that would not be comprehensible to a layperson.  It is set out in full in Appendix A to this Memorandum Opinion.

[19] *Id.* at 14-15 of 34.  The term "representative" is defined in § 9.103 of the Plan.  *See* D.I. 265-1 at 38.

the Releases in Section 6.11 of the Plan."[20]   Those sent to the holders in Class 2 (general unsecured creditors) provided the creditors with the option to "opt out" of the release regardless of whether the creditor voted in favor of or against the plan.[21] Importantly, nothing in this solicitation process imposed a third-party release on a class 2 creditor who never returned a ballot.  Priority creditors whose claims would be paid in full, and equity holders whose interests were unimpaired, would receive a clear notice of the third-party release.  While those parties could of course object to confirmation on the ground that the release was improper, the order did not contain even a form by which these parties could opt out of the releases.[22]

Based on the representation in the certificate of counsel that the solicitation procedures were fully consensual, the Court entered the order in the form proposed.[23] Between the time that order was entered and the confirmation hearing, the Supreme Court issued its decision in *Purdue Pharma*, which held that the Bankruptcy Code does not authorize bankruptcy courts to confirm plans that provide for nonconsensual third-party releases.   On August 14, 2024 (approximately six weeks after the Supreme Court decision in *Purdue Pharma*), the U.S. Trustee objected to confirmation of the plan on the ground that it provides for third-party releases based on the opt-out mechanic approved in the solicitation order, which is to say that

---

[20] D.I. 181-1 at 22 of 34 (capitalization in original).

[21] *Id.* at 30-31 of 34.

[22] *Id.* at 11-16 of 34; *see also id.* at 18-19 of 34 (notice provided to equity holders).

[23] D.I. 182.

creditors grant releases "even where a so-called 'Releasing Party' has not affirmatively agreed to them."[24]

The confirmation hearing took place on August 22, 2024. At the hearing, the U.S. Trustee raised two issues. *First*, the U.S. Trustee argued that the opt-out mechanism was improper, because the granting of a third-party release should require the releasing party affirmatively to express its consent to the release.[25] *Second*, with respect to class 1, the U.S. Trustee argued that it is improper to provide that a creditor that votes in favor of a plan should automatically be deemed to consent to the third-party release.[26]

Factually, there are two categories of creditors as to whom the validity of their releases are at issue.

- There are the creditors whose claims would be paid in full and equity holders who were unimpaired and thus presumed to accept. Neither of these groups were provided a ballot; and

- Those creditors in class 2 (general unsecured creditors) who voted in favor of or against the plan but did not check the box indicating that they intended to opt-out of the third-party release.

The record is perhaps more ambiguous about a third category – the DIP lender in class 1. The record indicates that the DIP lender, as the only creditor in class 1,

---

[24] D.I. 236 at 2.

[25] Aug. 22, 2024 Hr'g Tr. at 34.

[26] *Id.* at 38.

was thus the only creditor that received the form of ballot indicating that a vote in favor of the plan *necessarily* operated to grant the third-party release, without providing an opportunity to opt out.  During the August 22, 2024 hearing, however, it was represented to the Court that the DIP lender at first did not vote on the plan. But after the debtor agreed to remove its former officers and directors from the list of released parties, the DIP lender apparently changed its position and agreed to cast its vote to support the plan (and, it appears, to grant the release to the remaining released parties).[27]  So while the U.S. Trustee did argue that the plan improperly coerced class 1 creditors who wanted to vote in favor of the plan to grant a third-party release, the record suggests that the only creditor that was a member of that class itself negotiated an arrangement with the debtor that was acceptable to it.

It also bears note that as to the class of general unsecured creditors (class 2) what the debtor proposes is much more modest than the paradigmatic question posed by a typical "opt-out" plan – treating a creditor whose claim is impaired under the plan as "consenting" to the release when that creditor may have simply thrown away its ballot.  Here, the debtor does not propose to treat unsecured creditors who did not vote as granting the release.  Rather, in the class of unsecured creditors (class 2), the release applies only to those creditors who voted in favor of or against the plan but did not check the box to opt out of the release.  The release would also apply, however, to equity holders (who are unimpaired, in this subchapter V case, on account of the

---

[27] *Id.* at 29.  *See also* Exs. S6 & S7 (balloting reports showing DIP lender switching vote from not voting to voting in favor).

debtor's committing its projected disposable income for the plan period toward the repayment of its creditors) and priority creditors whose claims were entitled to be paid in full under the plan. Both groups were deemed to accept the plan, and thus neither group was solicited to vote.

At the confirmation hearing, after the evidence was submitted and the Court heard argument, the Court asked the parties whether it might be possible to enter an order that confirmed the plan (thus allowing the debtor to emerge from bankruptcy) while reserving the question of the third-party release.[28] Both the debtor and the U.S. Trustee agreed that doing so would be permissible and appropriate.[29] The debtor thereafter filed a certificate of counsel indicating that the parties had agreed to a form of order that so provided.[30] The Court entered that form of confirmation order, which provided that the Court would separately address the effectiveness of the third-party releases set forth in § 6.10 of the Plan.[31] This Memorandum Opinion is intended to address those remaining issues.

## Jurisdiction

The issue now before the Court is one that arises under the Bankruptcy Code and is therefore within the district court's "arising under" jurisdiction pursuant to 28 U.S.C. § 1334(b). That jurisdiction was referred to this Court under 28 U.S.C. § 157(a) and the district court's standing order of reference dated February

---

[28] Aug. 22, 2024 Hr'g Tr. at 44.

[29] *Id.* at 44-45.

[30] D.I. 264.

[31] D.I. 265 ¶ 31.

29, 2012.    As part of the plan process, this is a core matter under

28 U.S.C. § 157(b)(2)(L) and (O).

## Analysis

**I.    The U.S. Trustee's objection to the release deemed granted by unimpaired creditors and equity holders and class 2 creditors is properly preserved and presented; the objection to the form of ballot provided to class 1 creditors is not.**

The U.S. Trustee objects to three categories of third-party releases provided

for in the debtor's plan: (1) the releases deemed granted by unimpaired creditors and

equity holders; (2) the releases deemed granted by class 2 creditors who did not "opt

out"; and (3) the release deemed granted by class 1 creditors (the only one of which

appears to be the DIP lender), who would have been deemed to grant the release on

account of voting for the plan, without being given the opportunity to opt out.

The first question that ought to be considered is whether the U.S. Trustee

should be permitted to object to the opt out mechanism provided for here (as to any

of these three categories) after it had expressly consented to the entry of the

solicitation order that set forth that mechanism.  An argument can certainly be made

that the solicitation order, while an interlocutory order, should remain binding under

the "law of the case" doctrine.

In engaging that question, there is one point that the Court should clarify at

the outset.  There are certainly occasions when parties object to release language at

the stage of a bankruptcy case when a debtor seeks approval of a disclosure statement

and solicitation procedures, and courts overrule those objections on the ground that

those are matters that are more appropriately raised as confirmation issues.  In

15

*American Capital Equipment*, the Third Circuit explained that while "[o]rdinarily, confirmation issues are reserved for the confirmation hearing," in circumstances in which "there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure statement stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing."[32]

That means that in circumstances in which a release is obviously overbroad or unjustified, a court *could* take up the issue at the disclosure statement stage. But (particularly before *Purdue Pharma*) if a Court believed that it was possible that the evidence introduced at the confirmation hearing might inform the question of the release's propriety, a court could also defer consideration of the issue until confirmation.

In this Court's view, however, the *substance* of the release is different from the *procedure* the debtor proposes to use to solicit creditors. The reason debtors file motions for courts to approve their solicitation procedures is so that, before the estate incurs the expense of distributing the disclosure statement and plan ballot to creditors, all parties in interest have a chance to weigh in on the propriety of the proposed procedures, and the Court can resolve any dispute about them. Once a court has considered the motion and decided that the procedures are appropriate, that decision should not generally be subject to a subsequent challenge. That is the work

---

[32] *In re American Capital Equipment, LLC*, 688 F.3d 145, 153-154 (3d Cir. 2012) (internal quotation and citations omitted).

performed by the law-of-the-case doctrine, which "expresses the practice of courts generally to refuse to reopen what has been decided."[33]

That is not to say that a court *could not*, after approving solicitation procedures, decline to confirm a plan on the ground that the procedures were improper.  A solicitation order, which is entered as an intermediate step in the plan confirmation process, is an interlocutory one.  And courts always have the authority to reconsider their interlocutory orders if circumstances warrant such reconsideration.[34]  But the point of the law-of-the-case doctrine is that unless there is a reason to do so, things that have been decided should not later be undecided.

The law has long recognized an exception to that doctrine, as applied to interlocutory rulings, in circumstances in which "controlling authority has since made a contrary decision of law applicable to such issues."[35]  And at least as applied to the class 2 creditors and those creditors and equity holders who were never provided a ballot, the Court is satisfied that the *Purdue Pharma* decision is sufficient subsequent "controlling authority" to warrant reconsideration of the solicitation order.  In view of this Court's *Arsenal* decision, there would not have been much point to objecting to the solicitation procedures on the ground that they permitted opt-out

---

[33] *Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.).  Note, however, that it could at least be argued that because the solicitation order was the result of the parties' stipulation, rather than a matter that the Court actually decided, that the law of the case doctrine should not be deemed applicable.  *See Whitehouse v. LaRoche*, 277 F.3d 568, 577-578 n.9 (1st Cir. 2002).

[34] *See United States v. Jerry,* 487 F.2d 600, 604 (3d Cir. 1973); *John Simmons Co. v. Grier Bros. Co.*, 258 U.S. 82, 90-91 (1922).

[35] *White v. Murtha*, 377 F.2d 428, 432 (5th Cir. 1967).

releases.  So, to the extent the U.S. Trustee seeks to argue that *Purdue Pharma* requires a reconsideration of *Arsenal*, the law-of-the-case doctrine should not stand as an obstacle to making that argument.

The Court has a different reaction, however, to the U.S. Trustee's complaint about the form of ballot provided to class 1 creditors.  The argument the U.S. Trustee makes there is that it is improperly coercive to *require* a creditor, in order to be permitted to vote in favor of a plan, to grant a third-party release.  The Court views that argument as a serious one.  In addition to (and perhaps more problematic than) the issue of "coercion" is the concern that such a practice discourages creditors from voting and may distort the voting process, which is intended to provide a valuable signal about the extent of creditor support, within each voting class, for the plan's treatment of creditors' allowed claims.  None of those points, however, has been materially changed by the *Purdue Pharma* decision.  And the issue may well be beside the point here, where the only creditor that received this form of ballot was the DIP lender, which has participated actively in the bankruptcy case and expressly negotiated a form of appropriate release.  But to the extent the U.S. Trustee would otherwise be permitted to challenge the plan on the basis of the treatment of the release being given by the DIP lender, its failure to raise this issue in connection with the solicitation motion bars it from raising the same issue now.

## II.    After *Purdue Pharma*, a creditor granting a third-party release typically must affirmatively evidence its consent to the release.

On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.  The rationale of *Arsenal* was that creditors

that did not object to or opt out of a third-party release could essentially be "defaulted," with the release being imposed on them, despite their silence, on that basis. After *Purdue Pharma*, however, that relief is no longer appropriate under the ordinary principles that govern when a default may be entered. Instead, affirmative consent is required. While a number of courts have reached a contrary conclusion even after *Purdue Pharma*, this Court does not find their reasoning persuasive. Without addressing the limits on courts' authority to impose a default or providing a basis to distinguish the third-party release from the college education fund plan, the rationales of these decisions provide no limiting principle on what could be accomplished by what they describe as "consent."

Applying these principles to this case, the unimpaired equity holders and creditors whose claims will be paid in full and thus were not given the opportunity to vote cannot be said to have consented to the releases. *Purdue Pharma* left open the question whether in an appropriate case a *nonconsensual* release may be imposed on creditors whose claims are satisfied in full under a plan. On the undeveloped record here, however, the Court will not engage that question in this case. These parties therefore cannot be said to have granted a release.

The class 2 creditors who voted on the plan (whether they voted for or against), however, have taken a sufficient affirmative step to be deemed to consent to the third-party releases. These creditors were clearly informed and on notice of the right to opt-out of the releases before casting their votes. And because the ballot provided a simple mechanism by which these creditors could opt out, there is no risk of coercion

or distortion of the plan voting process.  Finally, the Court emphasizes that it is leaving open how it might decide a different case — one in which the plan process builds in the protections of the class action mechanism under Rule 23(b)(3), where an "opt-out" mechanism is deemed appropriate.

### A.    As a general proposition, creditors must affirmatively express consent to the release in order to be bound by it.

The question of a bankruptcy court's authority to grant a *nonconsensual* third-party release is one on which courts were divided for many years before the Supreme Court's recent decision in *Purdue Pharma*.  The Court is not aware, however, of any court that has found that a creditor cannot *consensually* release a claim against a third-party under a debtor's plan of reorganization.  And in holding that bankruptcy courts may not grant a nonconsensual third-party release, the Supreme Court's decision in *Purdue Pharma* went out of it its way to emphasize that "[n]othing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan[.]"[36]

That statement, however, raises a different question, and one that has also divided bankruptcy courts – what counts as consent for the purposes of a consensual

---

[36] *Purdue Pharma*, 144 S. Ct. at 2087 (emphasis in original).  One could perhaps raise the question whether even a party's affirmative consent provides a sufficient basis to justify the inclusion of a release of a non-debtor in a plan (as opposed to leaving the parties to enter into whatever arrangements they choose outside of bankruptcy, subject to all of the usual contractual requirements under non-bankruptcy law).  But it has been settled law, even in jurisdictions that have always followed the *Purdue Pharma* rule and prohibited nonconsensual third-party releases, that consensual third-party releases were permissible. *See generally In re PG & E Corp.*, 617 B.R. 671, 683 (Bankr. N.D. Cal. 2020).  That practice was not called into question in *Purdue* or raised by the parties here.  The Court accordingly proceeds on the understanding that the only question it needs to resolve is what constitutes consent under that principle.

release?  Is a release consensually given if creditors are notified (in clear and conspicuous language) that they will be deemed to give a release unless they elect to "opt out," with the creditor provided a simple mechanism (like checking a box on a form) to do so?  Or does consent require a creditor affirmatively to indicate the creditor's agreement, such as by checking a box to "opt in"?

This Court addressed that question in *Arsenal*.  There, the Court concluded that it was satisfied that the opt-out mechanism was appropriate.  The premise of that conclusion, however, was called into question by *Purdue Pharma* and is thus appropriately reconsidered.

In *Arsenal*, the Court broadly characterized the then-existing caselaw as falling within one of two categories.  One category of cases emphasized that the rights that a creditor holds against a third party are the *creditor's* property.  Outside of bankruptcy, one generally cannot infer that a party has "consented" to an arrangement whereby the party will give up its property based on the party's silence.  As Judge Bernstein explained in *SunEdison*, a party seeking to enter into a contract with another "cannot ordinarily force the other party into a contract by saying, 'If I do not hear from you by next Tuesday, I shall assume you accept.'"[37]

---

[37] *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017).  *See also Washington Mutual,* 442 B.R. at 352 (adopting similar reasoning); *Emerge Energy Services,* 2019 WL 7634308, at *18 (finding that, unlike in the context of claims objections or cure amounts, where creditors have a duty to respond, in the context of third-party releases "basic contract principles" are applicable and concluding that "while the Debtors included on the ballot and Opt-Out Form notice to the recipients of the implications of a failure to opt-out, the Court cannot on the record before it find that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release. Carelessness, inattentiveness, or mistake are three reasonable alternative explanations.").

The response to Judge Bernstein, however, is that litigants certainly can be required to respond by a date certain to a pleading that is validly served on them or risk losing their legal rights. Courts do exactly that every day when they enter default judgments to parties that fail to respond to a properly served complaint. And the practice of "defaulting" parties that do not raise objections is necessarily a regular part of bankruptcy practice. When a debtor seeks, as part of the sale of a business, to assume and assign 20,000 executory contracts that are listed in a 300-page schedule in small print, courts do not inquire into whether each and every contractual counterparty has affirmatively consented to the listed cure amounts. Rather, courts will require that each of the counterparties be served with the motion. A counterparty that does not respond will be deemed to have "consented" to it. In this context, the word "consent" is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.

Does that mean that the Court expects that each contractual counterparty has opened the mail, found its agreement on the schedule, and determined that the listed cure amount is in fact correct? Of course not. As the Court noted in *Emerge Energy Services*, it is just as likely (or perhaps more likely) that any particular counterparty's failure to respond was a result of "[c]arelessness, inattentiveness, or mistake."[38] But in the context of the sale of the debtor's business, courts routinely conclude that creditors and other parties in interest who are validly served with motions and other

---

[38] *Id.*

bankruptcy pleadings choose to ignore them at their own peril. Just like a defendant in a civil action that may face a default judgment if the defendant fails to respond to a summons and complaint, a creditor in bankruptcy that is served with a sale motion, a claims objection, or a plan of reorganization is "deemed" to understand that the bankruptcy proceeding may affect their legal rights and faces the risk of forfeiting those rights if the creditor chooses to stay silent in the face of such a motion, objection, or plan.

This Court's reasoning in *Arsenal*, in which it concluded that the opt-out mechanism was generally permissible, relied on this rationale, which had been expressed by the bankruptcy courts in cases such as *DBSD*, *Indianapolis Downs*, *Mallinckrodt*, and *Boy Scouts*.[39] In this Court's view, under then-controlling law, a third-party release was just a provision contained in a plan of reorganization, not fundamentally different from any other. And the Court explained that a party that objected to such a provision was required to speak up by objecting to the inclusion of that provision, much like the contractual counterparty must if it disagrees with the cure amount listed in the schedule.[40]

The Court noted, however, that other courts had taken issue with that line of reasoning. The courts that had insisted on an opt-in mechanism for a third-party release respond to the point above by saying, in substance: "Wait a minute. It is one

---

[39] *See DBSD,* 419 B.R. at 218-219; *In re Indianapolis Downs, LLC,* 486 B.R. 286 (Bankr. D. Del. 2013); *In re Mallinckrodt PLC,* 639 B.R. 837, 879 (Bankr. D. Del. 2022); *In re Boy Scouts of America and Delaware BSA, LLC,* 642 B.R. 504, 675 (Bankr. D. Del. 2022).

[40] *Arsenal,* 2023 WL 2655592, at *6.

thing to say to creditors that their rights will be lost if they fail to focus on the bankruptcy pleadings when it comes to their rights vis-à-vis the *debtor*. That is a necessary part of the bankruptcy process. But there is no reason to impose that obligation on them with respect to their rights against *third parties*." Judge Wiles put that point clearly in *Chassix*:

> [M]any creditors may simply have assumed that a package that related to the Debtors' bankruptcy case must have related only to their dealings with the Debtors and would not affect their claims against other parties. Charging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a 'consent' to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point.[41]

Before *Purdue Pharma*, this Court believed there was a fair response to that point. At least in this jurisdiction, there was Circuit precedent holding (or, at the very least, strongly implying) that courts could grant *nonconsensual* third-party releases.[42] Whether the provision was appropriate in any particular case would of course depend on the evidence the debtor presented at the confirmation hearing – and the standard was certainly a high one. But in light of the circuit authority, there was nothing that categorically distinguished the third-party release from the schedule of executory contracts and cure amounts. It was a plan provision that might or might not be permissible, based on the evidence to be presented at a later hearing.

---

[41] *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80-81 (Bankr. S.D.N.Y. 2015).

[42] *See Continental Airlines*, 203 F.3d at 203; *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000); *United Artists Theatre Co. v. Walton*, 315 F.3d 217 (3d Cir. 2003); *In re Global Industrial Technologies, Inc.*, 645 F.3d 201 (3d Cir. 2011) (en banc); *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019).

And a party that opposed that relief was under the same compulsory obligation as any other party on whom a motion, plan, or other pleading had been served. A party that does not file an appropriate objection runs the risk that their legal rights will be forfeited.

But this is what *Purdue Pharma* changes. After that decision, regardless of what facts the debtor may establish at the confirmation hearing, the third-party release is no longer a potentially permissible plan provision. Accordingly, it is no longer appropriate to require creditors to object or else be subject to (or be deemed to "consent" to) such a third-party release.

Longstanding doctrine in the context of the entry of default judgments in civil litigation under Rule 55 underscores this point. The District Court for the Middle District of Florida explained these principles clearly. Before entering a default judgment, "the Court must find that there is a sufficient basis in the pleadings for the judgment to be entered."[43] As the Eleventh Circuit explained it, a "default judgment cannot stand on a complaint that fails to state a claim."[44] Or in the Fifth Circuit's words, a default judgment is properly entered "only so far as it is supported by well-pleaded allegations, [which are] assumed to be true."[45] All that may be accomplished by the entry of a default, then, is that the "plaintiff's well-pleaded

---

[43] *GMAC Comm'l Mortgage Corp. v. Maitland Hotel Assoc.*, 218 F. Supp. 2d 1355, 1359 (M.D.Fla. 2002) (internal quotation and citation omitted).

[44] *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n. 41 (11th Cir.1997).

[45] *Nishimatsu Construction v. Houston National Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).

allegations of fact" are established as true.[46]  If relief may not be afforded on those facts – and it is now clear under *Purdue Pharma* that there are no set of facts that would justify the imposition of third-party release – that relief is not properly granted upon the creditor's default.

The rationale of *Arsenal*, under which the opt-out plan was permitted on the ground that the creditor's failure to opt out operated as a default, does not survive *Purdue Pharma*.  Accordingly, such releases cannot be described as "consensual" on the ground that the creditor's failure to assert an objection effectively allowed the release to be imposed by virtue of the creditor's default.  And in the absence of some sort of affirmative expression of consent that would be sufficient as a matter of contract law, the creditor's silence in the face of a plan and form of ballot can no longer be sufficient.

The principle that the opt-out plan was justified on the grounds of a creditor's default also provided a basis for distinguishing between the "consensual" third-party release before *Purdue Pharma* and the college education fund plan (described above). The former was the kind of relief that a court could properly enter upon an opposing party's default; the latter is not.  With that distinction eviscerated, there is no logical limiting principle to what a court might be able to do on the grounds that a creditor threw away the plan and the ballot, and thus "consented" to it.  To be sure, a litigant who throws away a validly served legal pleading does so at that litigant's risk.  That risk, however, is limited to relief that can lawfully be entered against that litigant if

---

[46] *GMAC Comm'l Mortgage*, 218 F. Supp. 2d at 1359.

the allegations in the pleading are true.  That risk does not include the possibility that a creditor will be required to contribute to the college education fund.  And after *Purdue Pharma*, it no longer includes the risk that the creditor will release a cause of action it may have against a third party.

The *Purdue Pharma* Court's discussion of the Bankruptcy Code's different treatment of direct versus derivative claims drives home this point.  The dissenting opinion had argued that the fact that a debtor may resolve a creditor's *derivative* claims against third parties suggested that the bankruptcy authority was not limited to restructuring the relationship between the debtor and its creditors.[47]  The majority opinion, however, responded by explaining that the whole point of a claim being *derivative* is that the claim is *not* the creditor's claim.  Rather, the claim is property of the estate, and is thus the debtor's to settle or not settle.[48]  The third-party release, however, "is nothing like that."[49]  Rather than being a claim that belongs to the debtor, the third-party release "seeks to extinguish claims against the [third parties] that belong to [the creditors]."[50]

That point is strikingly similar to the one made by Judge Wiles in *Chassix*.  It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties – which belong to the creditor and not the

---

[47] *Purdue Pharma*, 144 S. Ct. at 2107- 2108 (Kavanaugh, J., dissenting).

[48] *Id.* at 2083-2084.

[49] *Id.* at 2084.

[50] *Id.*

bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy.  In that context, "implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point."[51]  Indeed, while the Court appreciates that inferring consent by silence to a third-party release may, to seasoned bankruptcy professionals, "feel" different from inferring consent to the contribution to the college education fund, the only basis for that is the residue of the world as it existed before *Purdue Pharma*.  There is no longer any principled basis for drawing a line between the two.

Accordingly, whatever one might think about the propriety of third-party releases in the world before *Purdue Pharma*, this Court concludes that in light of that decision, there is no longer a basis to argue with the conclusion in cases like *Washington Mutual*, *Emerge Energy*, *SunEdison*, or *Chassix*.  While the undersigned had previously been comfortable, for the reasons described in *Arsenal*, concluding that creditors that failed to opt out may be deemed to consent to a plan's third-party release, the Court no longer believes it is appropriate to do so.

### B.    Decisions addressing the issue since *Purdue Pharma* reinforce this conclusion.

A number of thoughtful bankruptcy court decisions, issued since *Purdue Pharma*, have addressed this question.  In *Bowflex*, Judge Altenberg emphasized the same due process principles on which this Court relied in *Arsenal*.  In finding that a

---

[51] *Chassix*, 533 B.R. at 81.

creditor that receives clear and conspicuous notice of a third-party release is required to assert an objection if the creditor does not consent to the release, Judge Alternberg noted that "it is incumbent upon parties who have been properly served with pleadings to protect their own rights."[52]  Judge Lopez' decision in *Robertshaw* is to similar effect, emphasizing that the third-party release was clearly and conspicuously disclosed to all creditors, and that every creditor had the opportunity to opt out of the release.[53]

None of these cases, however, articulates a limiting principle.  This Court does not believe that the courts in *Bowflex*, *Robertshaw*, or *Invitae* would have confirmed a plan that required creditors to donate to the college education fund.  The reasoning of those cases, however, suggests no principle that would distinguish the "consensual" third-party releases they approved from a plan provision requiring such a

---

[52] *In re Bowflex, Inc.* Bankr. D.N.J. No. 24-12364, Aug. 19, 2024 Hr'g Tr. at 67.  *See also In re Invitae Corp.*, Bankr. D.N.J. No. 24-11362, July 23, 2024 Hr'g Tr. at 14.

[53] *In re Robertshaw US Holding Corp.*, Bankr. S.D. Tex. No. 24-90052, Memorandum Decision on Plan Confirmation (Aug. 16, 2024), D.I. 959 at 29.  There is, however, a relevant difference between *Robertshaw* on the one hand and *Bowflex* and *Invitae* on the other.  In *Robertshaw*, the bankruptcy court noted that even before *Purdue Pharma*, Fifth Circuit law had prohibited nonconsensual third-party releases.  *See, e.g., In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009).  But settled practice in that jurisdiction had nevertheless long permitted opt-out releases.  So unlike courts located in the Third Circuit, the court in *Robertshaw* certainly had a fair argument that *Purdue Pharma* made no difference in governing law.

Another point in *Robertshaw* warrants mention.  The decision in that case emphasized that under Rule 23, opt outs are permissible in class action cases involving claims for damages.  *Robertshaw* at 28 n.120.  While that is true, the critical difference is that in the class action context, a class is only certified after a court makes a factual finding that the named representative is an appropriate representative of the unnamed class members.  In the plan context, there is no named plaintiff, found by the court to be an adequate representative, whose actions may presumptively bind others.  As set forth in Part II.E, *infra*, the Court would be open to the argument that an opt-out regime would be appropriate if the plan process were to replicate the requirements of Rule 23(b)(3).

contribution.  In the face of the college education fund plan, one could equally assert, just as the *Bowflex* court did, that it is "incumbent on parties who have been properly served with pleadings to protect their rights."[54]

The part of the analysis that these decisions omit is that the obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so.  As described above, that is no longer the case in the context of a third-party release.

The Court finds the reasoning of the bankruptcy court in *In re Ebix* to be more persuasive.[55]  That court noted that bankruptcy courts regularly grant relief that is sought in a motion or under a plan when it is unopposed (consider the omnibus claims objection or schedule of cure amounts).  The *Ebix* court pointed out that "in those examples, there is consistently a basis in either the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure or other substantive law contemplating and authorizing that relief."[56]  Because there is no such authority to impose a third-party release, the *Ebix* court found that such releases were only appropriate in circumstances in which, following a contract model, there was evidence of an agreement to grant the release.[57]  This Court is persuaded by that reasoning.  That leaves only the task of applying these principles to the present case.

---

[54] *Bowflex*, Aug. 19, 2024 Hr'g Tr. at 67.

[55] *In re Ebix, Inc.*, Bankr. N.D. Tex. No. 23-80004, Aug. 2, 2024 Hr'g Tr.

[56] *Id.* at 11-12.

[57] *See also In re Tonawanda Coke Corp.*, Bankr. W.D.N.Y. No. 18-12156, Decision and Order (Aug. 27, 2024), D.I. 790 at 4 of 6 (applying contract model, after *Purdue Pharma*, to

### C.    Unimpaired creditors who are not solicited have not affirmatively expressed consent to the release; the Court is not persuaded, in the circumstances of this case, that a release should be imposed on the basis that these creditors' claims will be paid in full.

Under the plan at issue here, priority creditors are to be paid in full and are thus deemed to accept the plan. And the debtors' equity holders were unimpaired, and also presumed to accept. As such, those parties were not solicited to vote on the plan and were never given an opportunity to opt out. It is true that these parties were informed that the plan would operate to release their claims against third parties. So, under the reasoning of *Arsenal*, this Court would have found that it was incumbent on those parties to raise an objection if they did not in fact consent to the granting of the third-party release. For the reasons described above, however, that rationale does not survive *Purdue Pharma*. And as a matter of ordinary contract law, those parties' silence, in the face of language in the plan telling them that they would be giving the third-party release, is insufficient to bind them to it. "It is certain that, if the only facts are that A makes an offer to B, and B remains

---

consensual third-party release). Note that the *Tonawanda Coke* court engaged a choice-of-law analysis and applied New York state law to the question whether the creditors had adequately manifested consent. The *Tonawanda Coke* court may well be correct that the question of consent is controlled by state rather than federal law. *But see Field v. Mans,* 516 U.S. 59 (1995) (holding that the question of what level of reliance on a misrepresentation is required to show that a debt was obtained by means of fraud under § 523(a)(2) of the Bankruptcy Code turned on federal rather than state law, but looking to the prevailing view among the states to resolve that question). In the absence of any suggestion by any party that there are differences among any of the potentially applicable state laws on these issues, however, the Court does not believe it necessary to resolve that issue here.

silent, there is no contract."[58]  The Court accordingly will not find that the creditors who were not solicited to vote have validly consented to giving the third-party releases. [59]

It bears note, however, that *Purdue Pharma* also left open the possibility that a *nonconsensual* third-party release might be appropriate in a "paid-in-full plan." The Court did not elaborate on what it meant by that.  At some level, there may be a common sense to the notion that creditors who have suffered a single, indivisible injury, caused jointly by the debtor and non-debtors, and whose claims on account of that injury have been satisfied in full out of the bankruptcy estate, ought not be permitted to assert those same claims against non-debtors.  No party, however, has suggested that this is a basis on which the releases in this case may be justified.  The Court therefore does not believe this is an appropriate case to explore the contours of this paid-in-full doctrine, assuming (without deciding) that such a doctrine is even a thing.

---

[58] 1 *Corbin on Contracts* § 3.18.  *See also Restatement (Second) of Contracts* § 69, cmt. a ("Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance.").

[59] *See In re Kettner Investments, LLC,* Bankr. D. Del. No. 20-12366 (KBO), Feb. 15, 2022 Hr'g Tr. at 53 ("As for the unimpaired deemed to accept claims and interest holders, I also don't believe it's appropriate on this record to find that they have consented to the release…. These parties have had no opportunity to opt in and express their affirmative assent and agreement.").

**D.     Those class 2 creditors who voted, after receiving clear instruction that such a vote would operate to grant a release unless they opted out, and who were given a simple mechanism to opt out, may be deemed to have given the release.**

The Court finds that regardless of how class 2 creditors voted on the Plan, the vote is an affirmative step, and coupled with conspicuous notice of the opt-out mechanism, suffices as consent to the third-party releases under general contract principles.  As to those creditors in class 2 who voted *in favor* of the plan and elected not to opt out, the Court is satisfied that the plan releases are valid and appropriate as a matter of ordinary contract law.  Creditors who returned their ballots and voted in favor of the plan after being informed that doing so, unless they checked the box to opt out, have not been silent.  They have taken an affirmative step.  And under ordinary contract principles, what they have done is sufficient to hold them to the terms of the release.

In this respect, these creditors are in a position analogous to that of a consumer that makes a purchase over the internet, and "clicks through" to accept the terms and conditions of the sale.  The Ninth Circuit explained that such action is typically sufficient to give rise to an enforceable agreement.  An "enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."[60]

---

[60] *Berman v. Freedom Financial Network*, 30 F.4th 849, 856 (9th Cir. 2022).  *See also Meyer v. Uber Technologies, Inc.,* 868 F.3d 66, 75 (2d Cir. 2017).

Returning a ballot that contains a vote in favor of the plan after being expressly instructed that doing so will manifest agreement to a third-party release unless the creditor checks a box to opt out is no different than clicking through.  That is sufficient, as a matter of general contract principles, to bind the party to the terms of the release.[61]  And because the creditor had a simple means of opting out, unlike the form of ballot used in this case for class 1 in which creditors who voted in favor of the plan were denied that option, there is no reason to be concerned that this mechanism would discourage creditors from voting or distort the voting process.

The same rationale applies to those creditors in class 2 who voted against the plan and elected not to opt out.  They were provided clear instruction that a vote against the Plan would suffice to manifest agreement to a third-party release if they did not affirmatively opt-out by marking the box on the ballot.[62]  A vote against the plan serves as evidence that the creditor was on notice and actively engaged, and thus has taken an affirmative step such that consent can be established to bind the party to the terms of the release.

The Court appreciates Judge Wiles' position in *Chassix*, that "it [is] difficult to understand why any other action should be required to show that the creditor [who voted to reject the plan] also objected to the proposed third party releases… The additional 'opt out' requirement, in the context of this case, would have been little

---

[61] *See In re Jamby's, Inc.*, Bankr. D. Del. No. 24-10913 (KBO), Sept. 10, 2024 Hr'g Tr. at 58 ("[T]he creditor read the ballot and chose to vote in favor of the plan.  They took affirmative steps here.… They did not opt out.  So they affirmatively checked the box to vote on the plan and they did not opt out.  That, to me, is sufficient manifestation of consent to the release.").

[62] D.I. 181-1 at 14 of 34.

more than a Court-endorsed trap for the careless or inattentive creditor."[63]    Under the Bankruptcy Code, however, the creditor's vote is intended to indicate only whether the creditor does or does not accept the plan's *treatment* of the creditor's allowed claim.  As to consent to the third-party release, the touchstone is whether the creditor engaged in affirmative conduct to indicate the creditor's consent.  For the creditor who voted in favor of the plan, the act of casting the vote, in light of the clear instructions and the failure to check the available box to "opt out," was a sufficient action to say that the creditor had evidenced its consent.  On this rationale, there is no basis to distinguish between the creditor who voted in favor of the plan from the one who voted against it.

### E.    The Court need not address here whether a different outcome would be appropriate in a case in which the plan process built in the protections of Rule 23.

The Court also seeks to emphasize a further issue that today's decision does not decide.  In a recent article, two leading practitioners suggest that in the mass tort context, particularly in a case in which there is a factual basis for a court to make findings akin to those that a court makes when it certifies a Rule 23(b)(3) class action, a bankruptcy court can and should treat an estate fiduciary as a class representative, giving that representative the authority to bind absent class members, subject to those members receiving individual notice and being afforded the opportunity to opt out.[64]  There may well be merit to that point.  There are also challenges.  In some

---

[63] *Chassix*, 533 B.R. at 79.

[64] *See* Marshall S. Huebner and Kate Somers, *Opting Into Opting Out:  Due Process and Opt Out Releases*, 43 Am. Bankr. Inst. J. (Aug. 2024) at 26.

mass torts, for example, the reason that bankruptcy has become the last resort is that the plaintiffs lacked sufficient commonality to permit the defendant to obtain a global resolution through a Rule 23 class action.[65]  That question is not presented in this case.  But nothing in the Court's rejection of the opt-out release in the circumstances presented here should be construed to foreclose reaching a different outcome in a circumstance such as the one presented in that article.

\* \* \*

As noted above, the Court is sympathetic to the argument that a different outcome might better serve the underlying purposes of bankruptcy law, particularly the objectives of encouraging the fair resolution of parties' disputes in a way that grants all parties a measure of finality.  But this Court's application of ordinary and settled legal principles leads it to conclude that there is no longer a legal basis to distinguish a traditional opt-out plan from the college education fund plan, which no bankruptcy court would confirm.

That said, this should hardly pose an insurmountable barrier to the successful reorganization of most troubled businesses and their ability to obtain a measure of finality through the bankruptcy process.  Nothing in *Purdue Pharma* can be read to call into question the kind of exculpation approved by the Third Circuit in *In re PWS*.[66]  Nor is there a reason why, under *Emoral*, a debtor may not reach an appropriate resolution of an estate cause of action and thereby relieve third parties

---

[65] *See Amchem Prods. v. Windsor*, 521 U.S. 591 (1997).

[66] *PWS Holding*, 228 F.3d at 246.

of potential liability on alter-ego or veil-piercing claims.[67]   In addition, as further described above, the more modest form of opt-out plan that the debtor employed here involves sufficient manifestation of creditor consent to permit the enforcement of those releases.   And finally, the Court is at least open to the possibility that it may be appropriate to build class action protections into the plan process, and thus allow a named representative to act on behalf of creditors who do not affirmatively opt out.   Creative lawyers will undoubtedly dream up other tools, which will be considered, when presented, on their merits in light of applicable law.   But on the record now before it, this Court concludes that the plan's releases for those creditors who have not voted on the plan cannot be described as consensual, and therefore are not valid.

## Conclusion

The parties are directed to settle an appropriate order reflecting the foregoing ruling.

Dated: September 25, 2024

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

[67] *Emoral*, 740 F.3d at 875.

## APPENDIX A

### Language in Confirmation Notice Apprising
### Creditors of Plan's Third-Party Release

On the Effective Date, except as otherwise provided herein and except for the right to enforce this Plan, all persons (i) who voted to accept this Plan or who are presumed to have voted to accept this Plan and (ii) who voted to reject this Plan but did not affirmatively mark the box on the ballot to opt out of granting the releases provided under this Plan, under section 1126(f) of the Bankruptcy Code shall, to the fullest extent permitted by applicable law, be deemed to forever release, and waive the Released Parties of and from all liens, claims, causes of action, liabilities, encumbrances, security interests, interests or charges of any nature or description whatsoever based or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Case or affecting property of the Estate, whether known or unknown, suspected or unsuspected, scheduled or unscheduled, contingent or not contingent, unliquidated or fixed, admitted or disputed, matured or unmatured, senior or subordinated, whether assertable directly or derivatively by, through, or related to any of the Released Parties and their successors and assigns whether at law, in equity or otherwise, based upon any condition, event, act, omission occurrence, transaction or other activity, inactivity, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date in any way relating to or arising out of, in whole or in part, the Debtor, the Debtor's prepetition operations, governance, financing, or fundraising, the purchase or sale of the Debtor's securities, the Chapter 11 Case, the pursuit of Confirmation of this Plan, the consummation of this Plan or the administration of this Plan, including without limitation, the negotiation and solicitation of this Plan, the DIP Loan, and the DIP Loan Documents, all regardless of whether (a) a Proof of Claim or Equity Interest has been filed or is deemed to have been filed, (b) such Claim or Equity Interest is allowed, or (c) the Holder of such Claim or Equity Interest has voted to accept or reject this Plan, except for willful misconduct, gross negligence, fraud or criminal misconduct; provided, however, that the Debtor shall not be a Released Party until the Last Distribution Date if the Plan is confirmed under section 1191(b) of the Bankruptcy Code. Nothing contained herein shall impact the right of any Holder of an Allowed Claim or interest to receive a Distribution on account of its Allowed Claim or Allowed Interest in accordance with this Plan.